[No. 56932-1. En Banc. January 28, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. HERBERT RICE, JR., *Appellant*.

552

*Herbert Rice, Jr.,* pro se, and *Keyes & Schrawyer,* by *Lewis M. Schrawyer,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Howard W. Hansen* and *Joseph A. Brusic, Deputies,* for respondent.

UTTER, J. — Herbert "Chief" Rice, Jr., appeals his convictions for two counts of aggravated first degree murder.[1] Rice argues: (1) the trial court abused its discretion by not granting a change of venue; (2) the venire selection was irregular; (3) admission of hearsay statements of his codefendant,

---

[1]For one of the counts, Rice was convicted as an accomplice.

Russell McNeil, violated his constitutional right to confrontation; (4) "death qualification" of jurors created a guilt-prone jury during the guilt phase of his trial, thus denying him equal protection; and (5) there was prosecutorial misconduct during closing argument. We find none of Rice's arguments persuasive and affirm his convictions.

## FACTS

On the evening of January 7, 1988, 82-year-old Mike Nickoloff and his 74-year-old wife, Dorothy Nickoloff, were stabbed to death in their home. Mr. Nickoloff was stabbed so many times in the chest and face that the police initially thought he was killed by a shotgun. Mrs. Nickoloff had been stabbed twice in the chest and numerous times in the back.

The investigation soon led to two 17-year-old boys — Herbert "Chief" Rice, Jr., and Russell McNeil. McNeil was arrested on the evening of January 26, 1988, and confessed early the next morning. That same morning the police arrested Rice, and he also confessed within a few hours.

The confessions of McNeil and Rice agree on most of the following details. McNeil and Rice were driving around on the evening of January 7, 1988. Rice said he knew of a house they could rob. Only McNeil's confession states they showed their knives to each other on the way to the Nickoloff home. McNeil's confession; State's exhibit 85, at 10. Rice and McNeil went to the door, and Mrs. Nickoloff answered and let them inside. Rice used the Nickoloffs' phone to call his girlfriend, and McNeil used the bathroom. Then McNeil went into the kitchen where Mrs. Nickoloff was eating dinner. Rice went into the living room where Mr. Nickoloff was watching television. McNeil stabbed Mrs. Nickoloff repeatedly in' the back, but stated that he did not stab her in the chest. Rice stabbed Mr. Nickoloff several times, but noticed that he was still breathing so he "let him have it again" and screamed "you'd better die." Rice's confession; State's exhibit 86, at 13-15. Rice and McNeil do not agree on who started the stabbings, but they occurred virtu-

ally simultaneously. They stole two television sets, which they sold later that evening.

Both McNeil and Rice were charged with one count of aggravated first degree murder and one count of accomplice to aggravated first degree murder. In the alternative, they were each charged with two counts of felony murder. The prosecutor sought the death penalty against both defendants.

On August 25, 1989, McNeil pleaded guilty to two counts of aggravated first degree murder, and the prosecutor recommended two life sentences for him, to be served consecutively, without the possibility of parole. Brief of Appellant app., at 5 (Statement of McNeil on Plea of Guilty).

On November 6, 1989, voir dire began for Rice's trial. It was not disputed that Rice stabbed Mr. Nickoloff; therefore, Rice went to trial on December 5, 1989, solely to determine premeditation and aggravation. The jury found Rice guilty of one count of aggravated first degree murder for Mr. Nickoloff, and one count of accomplice to aggravated first degree murder for Mrs. Nickoloff. The jury was unable to reach a conclusion on the death penalty, so Rice was sentenced to two life sentences without parole. Rice appealed directly to this court, and we now affirm.

## ANALYSIS
### 1. Change of Venue

Rice argues the trial court committed error by failing to grant his motions for change of venue. Although there was considerable media attention in this case, we conclude the trial court did not abuse its discretion by failing to grant Rice's motions for change of venue.

On February 27, 1989, Rice first moved for a change of venue to either King or Spokane County. The trial court postponed hearing the motion until later in the proceedings. The trial court heard the motion for change of venue twice in this case, once prior to voir dire on October 24, 1989, and once after the jury panel was selected on December 1, 1989. On both occasions the trial court denied the motions.

In *State v. Hoffman*, 116 Wn.2d 51, 804 P.2d 577 (1991), we reiterated the law governing change of venue:

> A motion for change of venue should be granted when necessary to effectuate a defendant's due process guaranty of a fair and impartial trial but a defendant must show a probability of unfairness or prejudice from pretrial publicity.
>
> The decision to grant or deny a motion for change of venue is within the trial court's discretion and appellate courts are reluctant to disturb such a ruling absent a showing of abuse of discretion.

(Footnote omitted.) *Hoffman*, at 71 (citing *State v. Rupe*, 101 Wn.2d 664, 674, 683 P.2d 571 (1984) (*Rupe* I)); *State v. Stiltner*, 80 Wn.2d 47, 52, 491 P.2d 1043 (1971)). In *Hoffman* we also reaffirmed the application of the nine factors from *State v. Crudup*, 11 Wn. App. 583, 524 P.2d 479, *review denied*, 84 Wn.2d 1012 (1974), to determine whether a trial court abused its discretion in refusing to grant a motion for change of venue. *Hoffman*, 116 Wn.2d at 71-72. The nine factors we use are:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*Crudup*, 11 Wn. App. at 587 (citing Annot., *Pretrial Publicity in Criminal Case as Ground for Change of Venue*, 33 A.L.R.3d 17, 33 (1970)). The trial court employed these factors when it denied Rice's motion for change of venue.

Because each case is factually unique, previous cases applying the factors are helpful, but are by no means dispositive of the outcome. Applying these factors to Rice's case, we conclude that the trial court did not abuse its discretion by denying the motions for change of venue.

■ The first factor is whether or not the publicity was inflammatory. The publicity was mostly factual from the time of the murders until the trial. The articles described the crime, the elderly victims, and the two 17-year-old defendants who were arrested. See Defense exhibits A-H (Oct. 24, 1989). It was the crime that generated public reaction, not the publicity. *See Rupe I*, 101 Wn.2d at 675. Nor was McNeil's guilty plea, which implicated Rice in the murders, inflammatory.

In other cases defendants have also noted specific news articles that were inflammatory. *See, e.g., Hoffman*, 116 Wn.2d at 72. In this case, the appellant does not point to any particular news articles that were inflammatory. Therefore, this factor lends little support to the motion for change of venue.

■ The second factor is the degree to which publicity was circulated. The publicity in this case was so extensive that nearly all of the 153 prospective jurors noted on their juror questionnaires that they knew of the Nickoloff murders. Although this factor favors change of venue, widespread factual publicity does not invariably justify a change of venue. *See State v. Rupe*, 108 Wn.2d 734, 752, 743 P.2d 210 (1987) (*Rupe II*), *cert. denied*, 486 U.S. 1061 (1988).

The third factor we consider is the length of time from the publicity to the trial. The murders took place on January 7, 1988; McNeil pleaded guilty on August 25, 1989; and, voir dire began on November 6, 1989. Thus, voir dire occurred approximately 22 months after the murders and a little over 2 months after codefendant McNeil pleaded guilty. Previously, this court has not overturned denials of motions for change of venue when the trial took place 5 to 6 months after the murders. *See State v. Jeffries*, 105 Wn.2d 398, 409, 717 P.2d 722 (finding 6 months between the murders and the trial sufficient), *cert. denied*, 479 U.S. 922 (1986); *Rupe I*, 101 Wn.2d at 675 (finding 5 months between the murders and trial sufficient). Thus, the timing of the trial did not justify change of venue.

The fourth factor is the care exercised and the difficulty encountered in juror selection. The prospective jurors were repeatedly instructed regarding their duties and responsibilities. Over a 3-week period all of the prospective jurors underwent extensive individual questioning. Each juror that actually sat on the jury underwent two rounds of individual questioning. This extensive questioning allowed the court and counsel to examine the impartiality and demeanor of each juror. The care with which the jury was selected did not support a change of venue.

The fifth factor is the jurors' familiarity with publicity and its effect on them. As already noted, nearly all of the 153 prospective jurors had knowledge of the Nickoloff murders. However, the fact that a majority of prospective jurors had knowledge of the case, without more, is irrelevant. *Rupe* II, 108 Wn.2d at 751 (citing *Patton v. Yount*, 467 U.S. 1025, 1035, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984)). The relevant analysis is whether the jurors had such fixed opinions that they could not act impartially. *Rupe* II, at 751 (citing *Patton*, 467 U.S. at 1035).

Rice presented a public opinion researcher to testify regarding the impartiality of the members of the venire based upon their questionnaires. Due to internal inconsistencies in the answers, the researcher determined only 44 percent of the potential jurors were actually impartial. However, the validity of the researcher's conclusions is questionable because she did not include in her analysis the answers given by jurors during their individual questioning. Therefore, even though most prospective jurors were familiar with this case, we conclude Rice has not shown they were partial.

The sixth factor involves the challenges used by defense counsel. Rice's attorneys did not exercise all of the peremptory challenges they were allocated. Defense counsel argues it is not good trial practice to use all of the peremptory challenges that are available. Brief of Appellant, at 27 (citing 1 F. Lane, *Goldstein Trial Technique* § 9.29 (3d ed. 1984)). However, this court has noted that if a defendant does not exercise all peremptory challenges it is presumed

that he or she was satisfied with the jury. *Jeffries*, 105 Wn.2d at 409. Therefore, this factor does not favor change of venue.

The seventh factor we consider is the connection between government officials and the release of publicity. Rice concedes in his brief that there was no government connection with publicity. Brief of Appellant, at 27. Therefore, this factor also does not favor change of venue.

The eighth factor is the seriousness of the crime. Defendant was charged with aggravated first degree murder and the prosecutor sought the death penalty. This factor favors change of venue.

The ninth and final factor is the size of the area from which the venire is drawn. Yakima County had 73,148 registered voters on October 24, 1989. Previously, this court has upheld denial of motions for change of venue in *Rupe* II, 108 Wn.2d at 753, where the venire was drawn from 61,000 registered voters and *Jeffries*, 105 Wn.2d at 409, where the venire was drawn from 50,000 registered voters. This factor lends no support to the motion for change of venue.

Admittedly, some factors appear to support a change of venue. Most of the jurors were familiar with the Nickoloff murders, and an aggravated first degree murder case is one of the most serious crimes a person can be charged with. On the other hand, the judge was very careful and thorough during voir dire to ensure an impartial jury for a trial that took place nearly 2 years after the murders. Weighing all nine factors, we conclude that the trial court did not abuse its discretion by denying Rice's motions for change of venue.

## 2. Venire Selection

Rice's claim that the venire was selected in an irregular fashion encompasses two issues. First, he argues that the judge could not delegate the task of excusing jurors from serving under RCW 2.36.100 to the clerk of the court. Second, he argues that prospective jurors were excluded from the venire for reasons unrelated to those listed in RCW 2.36.100. We reject both of Rice's arguments.

In Yakima County the county clerk's office has been assigned the responsibility to excuse prospective jurors for hardship and other excuses pursuant to RCW 2.36.100. In December 1985, the administrative judge sent a memorandum to the county clerk's office setting forth specific guidelines for excusing prospective jurors. See Defense exhibit D (Nov. 30, 1989). The staff in the county clerk's office excuse potential jurors over the telephone and upon receipt of the jury selection questionnaires. When jurors are excused, their names are crossed off the master list and the excuse is noted. In this case of the 600 original summons that were mailed, approximately 450 people were excused by the county clerk's office or their summonses were returned as undeliverable.

Both the county clerk and the assistant county clerk testified regarding the procedure followed in Yakima County. The assistant county clerk testified that she was not personally aware of anyone among those summoned for the Rice case that was not granted an excuse that requested one. She also stated that only people who fit within the guidelines were excused. After testimony and argument on this issue, the trial court determined that the procedure followed in this case was consistent with RCW 2.36.100. Therefore, he denied Rice's motion for mistrial.

Rice contends Yakima County failed to follow the statutory requirements for jury selection because the clerk, not the judge, excused several prospective jurors for hardship and other personal excuses. The relevant statute provides that:

> Except for a person who is not qualified for jury service under RCW 2.36.070, no person may be excused from jury service by *the court* except upon a showing of undue hardship, extreme inconvenience, public necessity, prior jury service once in the last two years, or any reason deemed sufficient by *the court* for a period of time the court deems necessary.

(Italics ours.) Former RCW 2.36.100. The statutory language does not indicate whether the term "court" means the judge must exercise the power or whether the judge may delegate it.

■ ■ If the Legislative intent or meaning of a statute is unclear, the meaning of doubtful words may be determined

through their relationship to associated words and phrases. *Mercer Island v. Kaltenbach*, 60 Wn.2d 105, 109, 371 P.2d 1009 (1962); *Shurgard Mini-Storage v. Department of Rev.*, 40 Wn. App. 721, 727, 700 P.2d 1176 (1985); *Kucher v. Pierce Cy.*, 24 Wn. App. 281, 286, 600 P.2d 683 (1979); 2A N. Singer, *Statutory Construction* § 47.16 (4th ed. 1984). The most helpful clue in discerning the Legislature's intent here is the use of the terms "clerk", and "judge" in other subsections of RCW 2.36. In RCW 2.36.095 the Legislature gave power to the "*county clerk* [to] issue summons and thereby notify persons selected for jury duty." (Italics ours.) RCW 2.36.095. In RCW 2.36.110 the Legislature invests the judge with the power

> to excuse from further jury service any juror, who in the opinion of the *judge*, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

(Italics ours.) RCW 2.36.110. Thus, when the Legislature wanted to confer power solely upon the county clerk or the judge it did so in express terms. In contrast, by using the term "court" in RCW 2.36.100, the Legislature did not express a preference that any particular member of that institution — judge or clerk — perform the duties under RCW 2.36.100. Therefore, we conclude judges may delegate these tasks to clerks. The detailed procedures the Yakima County clerk's office must follow in excusing jurors supports our conclusion that delegation is appropriate.

Rice argues our recent decision in *State v. Tingdale*, 117 Wn.2d 595, 817 P.2d 850 (1991) requires a different result, but we find that case distinguishable. In *Tingdale*, the clerk excluded three individuals who knew the defendant without further inquiry. We held this procedure was a departure from the random procedure mandated by former RCW 2.36.090. We also noted that it is the judge, not the clerk, that has authority to dismiss for cause under CrR 6.4(c)(1). This case is distinguishable from *Tingdale* for two reasons. First, we have concluded that clerks have authority to excuse jurors for the reasons (hardship, etc.) listed in RCW 2.36.100. Second, there

is no indication here that specific individuals who might have been favorable to Rice were systematically excluded.[2]

■ Rice also argues the clerk excused jurors for reasons not listed in RCW 2.36.100. The degree to which the selection process for Rice's jury departed from the statute determines what burden Rice bears to prevail on this issue. As we wrote in *State v. Tingdale, supra* at 600:

> Where the selection process is in substantial compliance with the statutes, the defendant must show prejudice. If there has been a material departure from the statutes, prejudice will be presumed.

In *State v. Finlayson*, 69 Wn.2d 155, 417 P.2d 624 (1966), this court stated that the purpose of the jury selection statutes is to "provide a fair and impartial jury, and if that end has been attained and the litigant has had the benefit of such a jury, it ought not to be held that the whole proceeding must be annulled because of some slight irregularity". *Finlayson*, at 157 (quoting *State v. Rholeder*, 82 Wash. 618, 620, 144 P. 914 (1914)).

Significantly, the language of the statute grants courts broad discretion in excusing jurors. They may excuse jurors "upon a showing of undue hardship, extreme inconvenience, public necessity, prior jury service once in the last two years, *or any reason deemed sufficient by the court*". (Italics ours.) Former RCW 2.36.100. Although Rice notes a few isolated excuses of potential jurors that appear questionable, he has not demonstrated there was a gross departure from the statute or the County's guidelines. Thus, the burden is on Rice to demonstrate prejudice, which he has also failed to do. Therefore, we affirm the trial court's decision that the selection of the venire was proper.

---

[2]Rice argues a disproportionate number of elderly people and Native Americans, Rice's own race, were excluded from the venire. Brief of Appellant, at 30-31. Rice's claims, if true, could implicate not only our statutory requirements, but also his constitutional rights to an impartial jury under the sixth amendment to the United States Constitution and article 1, section 22 of the Washington State Constitution. But Rice has simply made bald, unsupported, assertions. Furthermore, Rice's contention that Native Americans were excluded is belied by the fact that 2 of the 12 jurors who ultimately served on his jury were Native Americans.

### 3. Admission of Codefendant McNeil's Statements

Rice argues admission of two hearsay statements made by his codefendant, McNeil, violated his Sixth Amendment right to confrontation. We conclude that the admission of those statements does not require reversal of Rice's convictions.

One of the statements admitted at trial which Rice objects to is part of a letter from McNeil to his former girlfriend, Melanie Siqueido. State's exhibit 77 (Dec. 7, 1989). The letter was written after McNeil had been in prison 2 months. The portion of the letter admitted by the trial court was presented by stipulation rather than live testimony of Miss Siqueido:

> It has been stipulated that if Melonie [*sic*] Siqueido was called as a witness, that she would testify as follows: That on or about April 12th, 1988, Russ McNeil wrote a letter to her, and that she is his former girlfriend. And that in the letter he wrote that Mr. Rice said to him while in the car prior to arriving at the Nickoloff home, quote, I know where we can get some money. It would be easy, stab them, end quote. Mr. McNeil wrote that Mr. Rice asked if Mr. McNeil had a knife and Mr. McNeil wrote that Mr. Rice, quotation marks, or, quote, pulled his out, closed [*sic*] quote.

Report of Proceedings vol. 59, at 6308.

The beginning and end of the letter are relevant for evaluating reliability, even though they were not admitted. At the beginning of the letter, McNeil states:

> Melanie, because I love u [*sic*] I'm going to be "*completely*" honest with you and tell you everything that I can remember that happened that night. After you read this I have no idea how you will feel towards me. I haven't told my *lawyers or anyone* yet . . .[.]

In closing, McNeil wrote:

> *I think* it would be better if you *got rid of this o.k.*

The other statement at issue is from an interview of McNeil by a detective soon after his arrest. Detective Rod Shaw interviewed McNeil during the initial investigation of the Nickoloff murders on January 27, 1988, almost 3 weeks after the murder. At first, McNeil denied even going into the Nickoloffs' home, claiming only Rice went in. Then he

admitted his participation, and told Shaw that Rice had said: "Maybe we should go out and stab someone and get some money." State's exhibit B (Nov. 30, 1989). Shaw wrote this statement in quotation marks near the top of his notes. Shaw then proceeded to tape record an interview with McNeil. Inexplicably, this statement was not included in the taped interview.

In an oral ruling, the court approved the admission of both of these statements. The State used the statements primarily to show that the murders of the Nickoloffs were premeditated.

We engage in a 3-part analysis to determine whether admission of a codefendant's inculpatory statements constitutes reversible error. First, we must determine whether the statements are admissible under our Rules of Evidence. Second, we consider whether additional indicia of reliability satisfy the requirements of the confrontation clause. Finally, even if a statement fails to meet these requirements, we consider whether or not the error was harmless. *State v. Whelchel*, 115 Wn.2d 708, 714-15, 801 P.2d 948 (1990).

A. Rules of Evidence.

First, application of our Rules of Evidence to both statements indicates they were admissible. Because both of McNeil's statements refer in turn to what Rice stated, there is a potential problem with multiple hearsay. ER 805 requires an independent basis for each part of a hearsay statement. We find an independent basis for admitting each part of the statements McNeil made.

Rice's statement to McNeil is admissible as a coconspirator statement "during the course and in furtherance of the conspiracy" under ER 801(d)(2)(v). In addition, Rice's statement was not hearsay because it was not "offered in evidence to prove the truth of the matter asserted." ER 801(c). *See State v. Miller*, 35 Wn. App. 567, 668 P.2d 606, *review denied*, 100 Wn.2d 1032 (1983). It was not used to show Rice actually stabbed and robbed the Nickoloffs. Instead, it was used to show premeditation. Therefore, Rice's statements to McNeil are not hearsay and are admissible.

■ Next, we must determine whether McNeil's statements to his girlfriend and Detective Shaw are admissible. The State contends both statements are admissible as statements against interest under ER 804(b)(3).[3] In *State v. Whelchel*, 115 Wn.2d 708, 801 P.2d 948 (1990), this court considered the admissibility of codefendant statements under ER 804(b)(3). It noted that inculpatory statements of codefendants are not invariably against a defendant's penal interest. For example, the notes accompanying Fed. R. Evid. 804(b)(3) state:

> [A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.

Fed. R. Evid. 804(b)(3) advisory committee note, exception (3). The overall circumstances surrounding McNeil's letter do not suggest the statements were self-serving. The statement made to Detective Shaw during police interrogation deserves greater scrutiny, because it was precisely the context in which one codefendant might attempt to shift blame onto another. McNeil's statement, however, did not "assign a minor role" to himself and "a major role" to Rice. *Whelchel*, 115 Wn.2d at 719. Through his statements, McNeil admitted to participation in the premeditated murder of two elderly people. Therefore, McNeil's statements are admissible under the Rules of Evidence.

B. The 9-Part Test for Reliability.

■ Statements which fall within a hearsay exception may still fail to satisfy Sixth Amendment confrontation clause requirements. *State v. Mitchell*, 117 Wn.2d 521, 817 P.2d 398 (1991); *State v. Anderson*, 107 Wn.2d 745, 733 P.2d 517 (1987). Additional indicia of reliability in the declarant's statement are necessary. As we wrote in *Anderson*, 107 Wn.2d at 750-51:

---

[3]There is no dispute over the fact that McNeil was unavailable to testify in person. Codefendant McNeil exercised his Fifth Amendment right against self-incrimination, thereby making him unavailable to testify for purposes of ER 804(a). *State v. Dictado*, 102 Wn.2d 277, 287, 687 P.2d 172 (1984). The parties stipulated to McNeil's unavailability.

The purpose of this inquiry into trustworthiness is to ensure that the proffered evidence offers some reliability in terms of the declarant's perception, memory, and credibility — a function traditionally performed by cross examination.

█ Before we apply our 9-part test for reliability, we emphasize that the focus is on the declarant at the time the declarant made the statement. We are *not* concerned with the testifying witness' reliability. *Anderson*, 107 Wn.2d at 751. The testifying witness is subject to oath, cross examination, and observation of demeanor. Therefore, Rice's assertions about the unreliable way in which Detective Shaw recorded Rice's statement are irrelevant. In fact, Rice's attorney vigorously cross-examined Detective Shaw, exposing any flaws in the way he recorded McNeil's statements.

We have delineated nine criteria that are indicative of reliability of out of court declarations. Those factors are: (1) whether the declarant had an apparent motive to lie; (2) whether the general character of the declarant suggests trustworthiness; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) whether the timing of the statements and the relationship between the declarant and the witness suggest trustworthiness; (6) whether the statements contained express assertions of past fact; (7) whether cross examination could not help to show the declarant's lack of knowledge; (8) whether the possibility of the declarant's recollection being faulty is remote; and (9) whether the circumstances surrounding the statements give no reason to suppose that the declarant misrepresented the defendant's involvement. *Whelchel*, 115 Wn.2d at 722-25. Applying these factors first to the letter, it appears very reliable. These same factors, however, suggest the statement made to Detective Shaw is not reliable.

The first factor is whether the declarant had an apparent motive to lie. McNeil's letter to his girlfriend appears to have been an outpouring of his emotions with little hope that it would benefit himself. At the beginning, he states that he is going to be " '*completely*' " honest with her because

he loves her. At the end of the letter, McNeil even tells her to get rid of the letter. This factor supports admissibility.

 However, McNeil had an obvious motive to lie to Detective Shaw. He was being interrogated. He had just tried to tell the officers he was not responsible, and not involved in the killings. He had a motive to shift blame onto Rice. Statements made in police custody by a coconspirator are almost presumptively unreliable. In approving the admission of a coconspirator statement in *Anderson*, this court wrote: "These were not statements made in police custody, nor were they statements made after police suspicions had been aroused." *Anderson*, 107 Wn.2d at 752. *See also Lee v. Illinois*, 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986) (holding there was a violation of confrontation clause where confession of codefendant during police custody used against defendant).[4] The circumstances under which McNeil made his statement suggest unreliability.

The second factor is whether the general character of the declarant suggests trustworthiness. Our concern is with general trustworthiness, not propensity toward virtue. *Anderson*, 107 Wn.2d at 753. Trustworthiness is present in the letter to McNeil's girlfriend. During cross examination, Rice's attorney asked Miss Siqueido if McNeil had ever lied to her. She replied "No". Report of Proceedings vol. 43, at 4982. This favors admissibility of the letter.

McNeil's trustworthiness is more questionable during the interview with Detective Shaw. He began by lying to Detective Shaw about his involvement, attempting to shift blame onto Rice. This suggests a lack of trustworthiness. *See Whelchel*, 115 Wn.2d at 722 (declarant deemed untrustworthy when he attempted to mislead police by filing a missing persons report).

The third factor, whether more than one person heard the statements, is largely irrelevant. In *Whelchel*, 115 Wn.2d at

---

[4]*But cf. Lee*, 476 U.S. at 553, 106 S. Ct. at 2068 (Blackmun, J., dissenting) (arguing that codefendant's confession to police was reliable where it in no way diminished his responsibility for the crime).

722, we stated that where a statement was taped, this factor was irrelevant. The same reasoning should apply to a letter or a statement memorialized in notes. However, it is worth noting that McNeil's candor might actually have been greater in his letter if he assumed only his girlfriend would read it.

The fourth factor is whether statements were made spontaneously. The letter was spontaneous, which suggests it is reliable. The statement to Detective Shaw was made in response to questions during interrogation, and therefore was not spontaneous and not reliable. *See State v. Mitchell*, 117 Wn.2d 521, 530-31, 817 P.2d 398 (1991); *State v. Whelchel*, 115 Wn.2d 708, 723, 801 P.2d 948 (1990).

The fifth factor requires us to examine the timing of the statements and the relationship between the declarant and the witness. The timing of the letter does not favor admissibility. It was written on April 12, 1988, more than 3 months after the murders. *See Whelchel*, 115 Wn.2d at 708 (statement deemed unreliable because 3 weeks passed before statement). But the close relationship between codefendant McNeil and his girlfriend does suggest reliability.

The statement to Detective Shaw was made a few weeks after the murders, so it may be slightly more reliable than the letter in that respect. However, there was no close relationship between McNeil and Shaw, which suggests it is unreliable.

The sixth factor is whether the statements contained express assertions of past fact. Both contain assertions of past fact, namely what happened the night of the murders. Therefore, they did not carry on their face a warning against giving them undue weight. *State v. Edmondson*, 43 Wn. App. 443, 450, 717 P.2d 784 (citing *Dutton v. Evans*, 400 U.S. 74, 89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970)), *review denied*, 106 Wn.2d 1016 (1986). Therefore, this factor weighs against admitting both statements.

The seventh factor, whether cross examination could not help to show the declarant's lack of knowledge, favors the admissibility of both statements. McNeil was present, and

knew what was occurring. The eighth factor, whether the possibility of the declarant's recollection is remote, also favors admissibility of the statements. Both statements were made soon after the murder — the letter about 3 months afterward, the statement to Shaw only 2 or 3 weeks afterward. As the court in *Mitchell*, 117 Wn.2d at 530, indicated, the ninth factor, whether the circumstances surrounding the statements give no reason to suppose the declarant misrepresented the defendant's involvement, is somewhat redundant.

Applying these factors to the letter, it appears reliable. It was a spontaneous outpouring by McNeil to his girlfriend. McNeil did not have a significant motive to lie to her. The statement to Detective Shaw is another matter. McNeil's statement was not spontaneous. He had every reason to distort the truth to shift blame onto Rice, and clearly did so at the beginning of the interview. He also had no close relationship to Detective Shaw. Therefore, at least under the factors we listed in *Anderson* and *Whelchel*, admission of the statement to Detective Shaw appears to violate Rice's right to confrontation.

C. Similarity of the Statements and Harmless Error.

Application of our 9-part test to McNeil's letter and statement does not end our inquiry. The similarity between the information contained in the letter and the statement indicates not only that any error was harmless but also that there was no violation of Rice's right to confrontation.

We deem constitutional error harmless if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error. *State v. Whelchel*, 115 Wn.2d 708, 728, 801 P.2d 948 (1990). Because the letter and the statement to Shaw contained the same information, the information in the statement was largely cumulative. There was also a large amount of direct and circumstantial evidence which tended to show the murders of the Nickoloffs were premeditated. Therefore, we find the admission of the statement to Detective Shaw was harmless.

In addition, the similarity between the information contained in the letter and the statement indicates Rice's Sixth Amendment right to confrontation was not violated. The nine factors we have employed to measure reliability need not be the sole test of reliability. The United States Supreme Court itself has declined to apply "a mechanical test" for determining whether particular guaranties of trustworthiness exist to satisfy the confrontation clause. *Idaho v. Wright*, 497 U.S. 805, 823, 111 L. Ed. 2d 638, 110 S. Ct. 3139, 3150 (1990).

When a codefendant's confession is virtually identical to that of a defendant, it may be deemed reliable as an "interlocking" confession. *Lee v. Illinois*, 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986).[5] Something analogous to interlocking confessions is present here: a statement and a letter by McNeil contained nearly identical information. The otherwise unreliable statement to Detective Shaw is reliable because of its similarity to the letter, which we do find reliable. Therefore, in the alternative, we hold that Rice's right to confrontation was not violated.

### 4. Equal Protection and Death Qualification of the Jury

Rice claims "death qualification" of his jury made it guilt prone, thereby violating his right to equal protection. "Death qualification" is "the process whereby prospective jurors are asked about the death penalty and excluded from the final panel if they oppose it." (Footnote omitted.) *State v. Hughes*, 106 Wn.2d 176, 180, 721 P.2d 902 (1986). In particular, Rice alleges that a violation of equal protection occurred because the prosecution withdrew its notice of intent to seek the death penalty against his codefendant, McNeil, but did not withdraw the notice against him. Rice argues the only differ-

---

[5]Admittedly, the United States Supreme Court in *Wright* has indicated that corroborating evidence generally is not relevant for the trustworthiness inquiry. Rather, such evidence is relevant for the issue of whether or not admission of a hearsay statement was harmless error. *Wright*, at 823-24. This court has also taken such a position. *Whelchel*, 115 Wn.2d at 726; *State v. Anderson*, 107 Wn.2d 745, 733 P.2d 517 (1987). Significantly, however, the Court in *Wright* did not reject interlocking confessions as a basis for establishing reliability. *Wright*, at 824. It appears to have only rejected the use of corroborating *physical* evidence to establish reliability.

ence between himself and McNeil is that Rice is a Native American. Because he faced the death penalty, the jurors in Rice's case were "death qualified", which he claims violated his right to equal protection.

 ██ The equal protection clauses of both the federal and state constitutions require that " ' "persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' " *State v. Schaaf*, 109 Wn.2d 1, 17, 743 P.2d 240 (1987) (quoting *State v. Phelan*, 100 Wn.2d 508, 512, 671 P.2d 1212 (1983)). This court has held that prosecutorial discretion in choosing to seek the death penalty does not invariably violate equal protection. *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984).

Because of the differences in the cases of Rice and McNeil, we are persuaded the prosecutor did not violate equal protection by only seeking the death penalty in Rice's case. The State initially sought the death penalty against *both* Rice and McNeil. It treated them exactly the same. It was only when McNeil pleaded guilty to two counts of aggravated first degree murder that the prosecution withdrew its notice of intent to seek the death penalty. See Brief of Appellant app., at 4-5 (Statement of McNeil on Plea of Guilty). In contrast, Rice did not attempt to plead guilty to aggravated first degree murder.[6] Also, there is reference in the record to mitigating evidence in the McNeil case which prompted the prosecutor's decision to withdraw the notice. Report of Proceedings vol. 8, at 639. Therefore, we reject Rice's equal protection argument.[7]

### 5. Prosecutorial Misconduct

Rice claims the prosecuting attorney engaged in misconduct during closing argument by suggesting Rice may have

---

[6]The record indicates Rice only offered to plead guilty to two counts of first degree felony murder. Report of Proceedings vol. 48, at 5260.

[7]Rice's argument of disparate treatment would merit serious consideration if the jury had in fact sentenced him to death. Then we would need to perform our statutorily mandated proportionality review under RCW 10.95.130(2)(b). Fortunately for Rice, the jury could not agree on the death penalty, so he was sentenced to two terms of life without parole.

stabbed Mrs. Nickoloff in the chest. The prosecutor stated that:

Dorothy Nickoloff laid on her back and that while on her back, either Russ McNeil or the defendant stabbed her twice in the chest, which were the more severe injuries. There were only two.

Report of Proceedings vol. 67, at 7025-26. Rice's counsel immediately objected to this argument, but the objection was overruled. At that time, the trial court instructed the jury that comments of counsel are not evidence. At the close of trial, Rice moved for a mistrial, arguing that the prosecutor's statement was not supported by the evidence. The trial court determined that because there was some indication that Rice had also been in the kitchen where Mrs. Nickoloff was slain, the argument was made within the confines of the evidence. Therefore, it denied the mistrial motion.

██ ██ We too conclude the prosecutor's argument did not amount to misconduct. "In closing argument, a prosecutor has wide latitude to draw and express reasonable inferences from the evidence." (Footnote omitted.) *State v. Mak*, 105 Wn.2d 692, 698, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986). The defendant bears the burden of establishing the impropriety of the argument and its prejudicial effect. *Hoffman*, 116 Wn.2d at 93. "[R]esolution of this issue [prosecutorial misconduct] is within the sound discretion of the trial court." *Mak*, 105 Wn.2d at 726. We do not find that the trial court abused its discretion when it decided the prosecutor did not make any arguments based on unreasonable inferences during closing argument.

Rice also cites *State v. Davenport*, 100 Wn.2d 757, 675 P.2d 1213 (1984), claiming that the prosecutor charged Rice with a new crime during closing arguments. In *Davenport* the prosecutor commented upon the law of "accomplice" liability when the defendant was not charged as an accomplice and the jury was not instructed on the relevant law. *Davenport*, at 760. In contrast, the prosecutor in this case did not comment on a new area of law. He simply interpreted facts present in the record.

Even were we to conclude the prosecutor's comment was improper, Rice did not suffer prejudice. The trial court minimized prejudice when it stated the State's argument was not evidence. *See State v. Martin*, 41 Wn. App. 133, 140, 703 P.2d 309, *review denied*, 104 Wn.2d 1016 (1985). Therefore, we affirm the trial court's refusal to grant Rice's motion for a mistrial at the close of the case.

CONCLUSION

After carefully reviewing the arguments of both parties and the lengthy record in this case, we find that none of the errors alleged by Rice warrants reversal. Therefore, his judgment and sentence are affirmed.

DORE, C.J., and BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.