# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | ) | |
|---|---|---|
| | ) | No. 67560-5-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| ISAIAH M. KALEBU, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 31, 2014 |

GROSSE, J. — King County local court rules require that a jury be summoned from an assignment area in which the crime took place, here, Seattle. In the present case, 3,000 potential jurors were summoned from the entire county rather than from the designated assignment area. In order to comport with the local rules, the trial court removed the incorrectly summoned jurors, leaving a venire of approximately 2,000 potential jurors from the correct assignment area. The trial court did not abuse its discretion in proceeding with the jury selection over defense counsel's objection, particularly here, where there were more than sufficient jurors from which to obtain a jury panel. In addition, we find no merit to the defendant's contention that he was denied his constitutional right to be present at a critical stage of the trial. We affirm the judgment and conviction.

## FACTS

At midnight on Saturday, July 18, 2009, Teresa Butz and her partner, Jennifer Hopper, went to bed in Butz's three bedroom home in Seattle. Shortly after midnight, Butz and Hopper awoke to find Isaiah Kalebu standing over Butz with a knife in his hand. Kalebu put the knife to Hopper's throat, telling her to be quiet, that he only

wanted sex. He then proceeded to rape both Hopper and Butz multiple times while holding the knife. At one point both women were resisting and Kalebu was cutting and stabbing both of them. Butz managed to force Kalebu off the bed and they struggled. While Butz struggled, Hopper was screaming as loudly as she could. Butz picked up a metal bedside table and pushed Kalebu back with it and then crashed through a closed window, landing outside, and running as far as the curb before she collapsed. Hopper and Kalebu both ran in different directions. Hopper ran to the neighbors who had heard the window break and the screams and called 911.

Butz suffered several injuries, including eight cuts across her throat, a stab wound that severed her left bicep muscle, and another that penetrated her heart. She died in the street. Hopper had two cuts to the inside of her left arm, four lacerations on her neck, one of which severed her external jugular vein. Hopper was taken by ambulance to the emergency room where a plastic surgeon repaired her cuts. Swabs were used to collect evidence samples from both Hopper's and Butz's bodies.

The evidence from the swabs was entered into the deoxyribonucleic acid (DNA) databank and the profile matched that of an unknown male from a 2008 police case. There was a security video from that case which was shown to the media five days after the crimes. The man was identified as Isaiah Kalebu by a prosecutor who was handling an ongoing criminal case against Kalebu and had seen him at two hearings that week. Kalebu's mother also identified him.

Police found blood on the window ledge and saw dirty fingerprints on the edge of the tub. A latent print on the outside of the bathtub was identified as the print from Kalebu's left ring finger. Kalebu's left palm print was identified in two separate

2

examinations. Additionally, a print of the outer edge of Kalebu's left palm was found on the front edge of the dresser in the northwest bedroom. All of the prints were identified separately by two examiners.

Bare footprints found at the scene were identified as Kalebu's. Spermatozoa found on khaki shorts matched Kalebu's profile. A DNA profile matching Kalebu was obtained from boxer shorts found in the house. The swabs taken from Butz contained two DNA profiles, Butz's and Kalebu's. Additionally, swabs taken from Hopper also revealed Kalebu's DNA profile.

When Kalebu was arrested, he was wearing jeans that tested positive for DNA for which Kalebu, Butz, and Hopper were also possible contributors. Hopper identified Kalebu as the assailant.

Kalebu was arrested. Throughout the pretrial court proceedings, Kalebu's behavior was outrageous. After a three day contested competency hearing, the trial judge found Kalebu competent to stand trial. Kalebu continued to act outrageously, engaging in a tirade asserting his incompetency and threatening suicide. The trial judge found that Kalebu's erratic behavior was a result of his conscious choices to act in ways that he thought would benefit him. Recognizing that such behavior would impact a jury, the judge barred Kalebu from the courtroom. The court provided Kalebu with a remote location from which he could watch the trial proceedings. Kalebu had access to his attorneys and was able to communicate with them. Even separated from the courtroom, there was no end to his fractious behavior.

A jury convicted Kalebu of aggravated first degree murder, attempted first degree murder, first degree rape, and first degree burglary, all with deadly weapon

enhancements. The court imposed the mandatory term of life without the possibility of early release on the aggravated murder conviction. Additionally, the court imposed exceptional sentences on the aggravating factor of deliberate cruelty that the jury found as to counts 3 and 4. Kalebu was sentenced to life plus 1,176 months.

Kalebu appeals contending the trial court erred in denying his motion to strike the entire venire because the court initially summoned jurors from outside the assignment area rather than the one required by the local rule. Kalebu also argues that he was denied his constitutional right to be present for all critical stages of the trial when he was absent from an in-chambers discussion regarding the procedure that would be followed for Kalebu's testimony.

ANALYSIS

<u>Venire</u>

Kalebu argues that the trial court, by summoning jurors county-wide, violated both RCW 2.36.055 and King County Local General Rule (LGR) 18(e). We disagree. We review the decision excusing jury venire members for an abuse of discretion.[1] Where there is substantial compliance with the statute, the defendant must show prejudice. Prejudice is presumed only where that has been a material departure from the statutes.[2] "[T]he purpose of the jury selection statutes is to 'provide a fair and impartial jury, and if that end has been attained and the litigant has had the benefit of

---

[1] <u>State v. Tingdale</u>, 117 Wn.2d 595, 600, 817 P.2d 850 (1991).
[2] <u>Tingdale</u>, 117 Wn.2d at 600.

4

such a jury, it ought not to be held that the whole proceeding must be annulled because of some slight irregularity.'"[3]

RCW 2.36.055 provides:

The superior court at least annually shall cause a jury source list to be compiled from a list of all registered voters and a list of licensed drivers and identicard holders residing in the county.

In a county with more than one superior court facility and a separate case assignment area for each court facility, the <u>jury source list may be divided into jury assignment areas that consist of registered voters and licensed drivers and identicard holders residing in each jury assignment area</u>. Jury assignment area boundaries may be designated and adjusted by the administrative office of the courts based on the most current United States census data at the request of the majority of the judges of the superior court when required for the efficient and fair administration of justice.[4]

The intent of the legislature was to lessen the burden of travel on potential jurors in counties with more than one superior court.[5] King County implemented this statute by promulgating LGR 18(e):

Location for Jury Assignment Areas for Civil and Criminal Cases Filed in King County.
(1) *Designation of Jury Assignment Areas.* The <u>jury source list shall be divided into a Seattle jury assignment area</u> and a Kent jury assignment area that consist of registered voters and licensed drivers and identicard holders residing in each jury assignment area. The area within each jury

---

[3] <u>State v. Rice</u>, 120 Wn.2d 549, 562, 844, P.2d 416 (1993) (quoting <u>State v. Finlayson</u>, 69 Wn.2d 155, 157, 417 P.2d 624 (1966)).

[4] (Emphasis added.)

[5] "The legislature finds that superior courts with more than one superior court facility are asking some jurors to travel excessively long distances to attend court proceedings. In these cases, the legislature further finds that consideration of a juror's proximity to a particular courthouse can be accommodated while continuing to provide proportionate jury source list representation from distinctive groups within the community. The legislature intends to lessen the burdens borne by jurors fulfilling their civic duties by providing a mechanism that narrows the geographic area from which the jurors are drawn while maintaining a random and proportionate jury pool." LAWS OF 2005, ch. 199 § 1.

assignment area shall be identified by zip code and documented on a list maintained by the chief administrative officer for the court.

(2) *Where Jurors Report.* Individuals receiving a jury summons shall report for service to the Court facility in the jury assignment area identified on the face of the summons.

(3) *Adjustment of Jury Assignment Area Boundaries.* The jury assignment areas contained in this rule may be adjusted by the administrative office of the courts based on the most current United States census data at the request of the majority of the judges of the superior court when required for the efficient and fair administration of justice.

Kalebu's case was assigned a Seattle case designation at filing. Because the court understood that every aggravator case tried since the new rule went into effect had drawn jurors from the entire county, the court anticipated the defense requesting the same and ordered jurors be summoned from the entire county. However, defense counsel objected to the venire being from the entire county. Defense counsel sought to strike the entire venire.

The entire venire consisted of a group of 3,000 potential jurors, 1,000 of whom were identified as being from the south end. Rather than dismiss the entire venire, the court directed the clerk to notify the jurors from the south assignment area not to appear. That left a venire of approximately 2,000 jurors from the north end from which to choose a jury.

In support of his argument that the venire should have been dismissed, Kalebu cites State v. Tingdale.[6] There, over defense objection, the trial court authorized the court clerk to excuse three people from the panel based on the clerk's subjective knowledge that they were acquainted with the defendant. Our Supreme Court concluded the trial court's ruling was not in substantial compliance with chapter 2.36 RCW because the practice permitted the trial court or the clerk "to assemble a jury

---

[6] 117 Wn.2d 595, 817 P.2d 850 (1991).

6

panel of their own choosing," violating the statutorily required element of chance and calling into doubt the impartiality of the jury.[7] The court also noted that there was no factual basis to dismiss two of the three potential jurors for cause.[8] Here, unlike Tingdale, the trial court did not systematically exclude specific individuals who were favorable to the defendant.

Tingdale is completely inapposite. Kalebu has shown neither a material departure from the jury selection statute nor any resulting prejudice. The trial court did not abuse its discretion in resolving this procedural irregularity. This is in accord with Supreme Court cases that have held that when a jury list of county residents is not drawn exactly as required by law, it is not a material departure from the law where the defendant has been provided a fair and impartial jury.[9] No single method of jury selection is required "so long as fair and random selection of the master jury list and jury panels is achieved." RCW 2.36.065. Here, the jurors were chosen from the area specified by both the statute and the court rule. The trial court did not abuse its discretion in fashioning this remedy.

Chambers Conference

Kalebu next argues that he was excluded from a critical stage of the proceedings. At the conclusion of the State's case in chief, defense counsel notified the court that Kalebu would be testifying but that counsel would not be asking him any

---

[7] Tingdale, 117 Wn.2d at 601.
[8] Tingdale, 117 Wn.2d at 601-602.
[9] See, e.g., City of Tukwila v. Garrett, 165 Wn.2d 152, 196 P.3d 681 (2008) (jurors selected from outside city limits but city was located entirely in one county and all jurors were drawn from the county in which the crime was committed); W.E. Roche Fruit Co. v. Northern Pac. Ry. Co., 18 Wn.2d 484, 139 P.2d 714 (1943) (women jurors solicited by coupon ad in the newspaper).

7

questions. The court was concerned about the procedure by which Kalebu would testify and inquired of counsel why no questions would be asked of him. Kalebu's counsel explained:

> The court rules provide that a party or representative of the party cannot put forth or present evidence that is not material or relevant to the matter that is at trial.
> As I indicated yesterday, based on my discussions with Mr. Kalebu, I do not believe that -- in one part what he wants to testify about is material or relevant to this matter.
> The second part, I can't tell the court. If the court wants to hear that in chambers, I'd be happy to tell the court what that is.

In chambers, without the defendant or the prosecutor, defense counsel informed the court that Kalebu told counsel he wanted to take the stand and confess, planning to testify that God made him do it. Such testimony would raise the specter of an obligation on the part of defense counsel to seek a mental health defense, a strategy not pursued after the court found Kalebu's competent. But the court noted that it was Kalebu's right to testify even if counsel advised against such testimony. However, the court did not want Kalebu to testify in a narrative form and requested that defense obtain from Kalebu questions that Kalebu wanted asked and that his attorneys would pose those questions to him.

Kalebu was aware of the issue that was being addressed both before and after the conference. A court reporter was present at the discussion in chambers for the specific purpose of providing a transcript to Kalebu.[10] Defense counsel said he had explained to Kalebu that he had a choice whether to testify or not. Defense counsel also advised Kalebu that if he wanted to confess, pleading guilty might be the better course. Kalebu refused.

---

[10] There is nothing in the record to indicate whether Kalebu received this transcript.

As the court noted, ultimately the decision over whether to testify is the defendant's decision. The question the court was concerned with here was how his testimony would be presented, the procedure by which Kalebu would testify, not his testimony itself. This was not a critical stage of the proceedings.

A defendant's fundamental right to be present at all critical stages of a trial derives from the confrontation clause of the Sixth Amendment and the due process clauses of the Fifth and Fourteenth Amendments.[11] Critical situations are those in which the defendant's presence is necessary in order to provide him an opportunity to defend against the charge.[12] But a defendant does not have a constitutional right to be present during in-chambers or bench conferences between the court and counsel on legal matters, at least where those matters "do not require a resolution of disputed facts."[13] Here, there were no disputed facts. The court was simply setting forth the procedure by which Kalebu would present his testimony.

We note that even if we were to find that Kalebu had the right to be present, any violation of that right is subject to harmless error analysis.[14] The State bears the burden of proving beyond a reasonable doubt that the error is harmless.[15] A defendant has the right to be present for proceedings involving ministerial matters.[16]

---

[11] State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011) (citing Rushen v. Spain, 464 U.S. 114, 117, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983)).

[12] Irby, 170 Wn.2d at 880-81 (quoting Snyder v. Commonwealth of Mass., 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), overruled in part on other grounds sub nom by Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

[13] Matter of Pers. Restraint of Lord, 123 Wn.2d 296, 306, 868 P.2d 835 (1994).

[14] Irby, 170 Wn.2d at 885.

[15] Irby, 170 Wn.2d at 886 (quoting State v. Caliguri, 99 Wn.2d 501, 509, 664 P.2d 466 (1983)).

[16] Matter of Pirtle, 136 Wn.3d 467, 484, 965 P.2d 593 (1998).

Here, Kalebu argues that his absence from the chambers consultation deprived him of an opportunity to revisit his decision about testifying. However, that does not explain how his absence affected the outcome. The evidence in this case was overwhelming. Kalebu's claim that he might have reconsidered testifying had he heard the discussion in chambers is without merit. Kalebu's identity as the attacker was proven multiple times, by overwhelming forensic evidence, including his footprints at the foot of the bed in the bedroom where the attacks occurred; his palm print on the dresser in that room; his fingerprint and palm print on the bathtub where the intruder entered; his footprint on a document in the hallway; DNA matching Kalebu's on the khaki shorts he used to wipe himself, on swabs from two areas on each of the women attacked, and on two locations on the boxer shorts left by Kalebu when he left. Kalebu was identified by the surviving victim.

Affirmed.

_____

WE CONCUR:

_____          _____