# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

JAMES MICHAEL MCCLURE,

Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 70516-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 17, 2014

APPELWICK, J. — A jury found McClure guilty of felony harassment. McClure fails to demonstrate that excusal of two jurors prior to presenting the venire for voir dire violated his public trial right or right to be present at all critical proceedings. We also conclude that the evidence was sufficient to establish a "true threat" to kill and the victim's reasonable belief that McClure would carry out his threat. We affirm.

## FACTS

Between December 2012 and January 2013, James McClure called the Island County 911 dispatch center more than 100 times, sometimes up to 15 times per night. Each call lasted at least 6 to 7 minutes, and McClure frequently asked to talk to dispatcher Erin Peterson. McClure never reported any emergencies, but generally talked about his years of service in the Navy, his wife, and poker. McClure's conversations were occasionally rambling and vulgar, and he sometimes sounded intoxicated.

On December 28, 2012, McClure delivered a suspicious package to the dispatch center addressed to Peterson. The bomb squad responded and determined that the package contained playing cards, a book about poker, and some written notes.

No. 70516-4-I/2

Based on the package incident and McClure's continuing calls, Island County Sheriff's Lieutenant Mike Hawley began an investigation. Lt. Hawley attempted to contact McClure several times, but he was not home. On January 6, 2013, Hawley spoke with McClure by telephone and threatened him with arrest if he did not stop the calls.

Immediately after the conversation with Hawley, McClure placed another series of calls to the dispatch center. In one of the calls, McClure had the following conversation with the dispatcher:

> JAMES McCLURE: This is a message for whoever the senior bastard is, you have a Hawley that used to be sheriff.
>
> ERIN PETERSEN: Okay.
>
> JAMES McCLURE: I had to sign a letter that said I would not talk about, discuss or release any press releases for 20 years after I got out of the Navy. And I got out of the Navy on the 31st of May, 1993. But due to Internet technology and everything else, it's leaking out.
>
> So I'm kind of fuzzy a little bit. So I cleared it with three Navy captains and an admiral.
>
> . . . .
>
> ERIN PETERSEN: Okay.
>
> JAMES McCLURE: Lives right here on Whidbey Island. They're all retired.
>
> ERIN PETERSEN: So you're [sic] weren't supposed to do -- You weren't supposed to talk about what? I'm sorry.
>
> . . . .
>
> JAMES McCLURE: Everything I did in the Navy.
>
> ERIN PETERSEN: Okay.

-2-

JAMES McCLURE: Okay. And my Navy references are: VO-67, Albadron-67 (phonetic), VAH-21, Heavy 21.

ERIN PETERSEN: Mm-hmm.

JAMES McCLURE: And I had an Ace of Diamonds and a Queen of Spades painted on my tail. Yes, ma'am. I put 'em up there myself.

ERIN PETERSEN: Mm-hmm.

JAMES McCLURE: Pretty thing. Pretty thing. Gun ships, ma'am. Gun ships.

And after I talked to captain -- Well, I talked to the Master Chief first. He's here, too. He talked with Captain. Captain called me. Captain called the Admiral. Admiral approved it.

He says, "Forget about that last five months, Chief. Go ahead and let him have it."

ERIN PETERSEN: Okay.

JAMES McCLURE: You know what the Admiral wants to see happen to Mike Hawley?

ERIN PETERSEN: Oh. I don't know.

JAMES McCLURE: Smoking hole (indiscernible).

. . . .

JAMES McCLURE: I don't know what he did to piss the admiral off, but the admiral said, "Chief, you're flying tonight in a black airplane. We're all going to bed with their wives, you poor E7 son of a bitch. Now, go get 'em!"

. . . .

ERIN PETERSEN: Mmm.

JAMES McCLURE: Ahhh! That was terrifying!

ERIN PETERSEN: Goodness.

JAMES McCLURE: So I had another little -- Ma'am, I had another little drink of scotch.

No. 70516-4-I/4

ERIN PETERSEN: Okay.

JAMES McCLURE: Put all the switches up. Turned all the knobs to the right. Push all the levers all the way forward.

. . . .

JAMES McCLURE: U.S.S. Barque Road I is ready for combat.

. . . .

ERIN PETERSEN: Okay.

JAMES McCLURE: And so is Navy 902 circling overhead. And them 30-caliber mini guns, they're so heavy my wings are tipping down. And when I blast, there's nothing left.

I'll take out that filbert or walnut farm, his wife, his kids. And you know what? I'll feel no sorrow tomorrow.

ERIN PETERSEN : You would -

JAMES McCLURE: Because the admiral told me to do it.

ERIN PETERSEN: Okay.

JAMES McCLURE: And I love it! That's why I got 31 years, six months and 17 days as an E7.

. . . .

ERIN PETERSEN: Okay.

JAMES McCLURE: Yeah. Because they just send me the shit like this.

ERIN PETERSEN: Oh.

JAMES McCLURE: I think they (indiscernible). Because I'm a Cherokee outlaw. They look through the windows to see if they can find me my buffalo graves.

Hawley lived with his wife M'Liss Hawley on a five acre farm with an orchard of filberts and walnuts. The property is not open to the public. Upon learning of the personal references in McClure's call, Hawley alerted his wife to the threats.

-4-

Hawley investigated a similar series of calls that McClure placed to the dispatch center in 2008. Hawley and other officers repeatedly contacted McClure at his house in an unsuccessful effort to persuade him to stop the calls. During the 2008 incidents, McClure was arrested for brandishing a flare gun in a local attorney's office. Another attorney obtained a protection order against McClure for threatening and harassing calls. Based on the protection order, Hawley removed 6-12 firearms from McClure's house.

Lt. Hawley took McClure's threats seriously. He knew that McClure "had gone mobile [and] was out driving all the time." He believed that McClure was unpredictable and dangerous and could be "spiraling out of control." Based on the information supplied by her husband, Ms. Hawley believed the threat was serious and credible.

The State charged McClure with one count of felony harassment, threat to kill, involving Ms. Hawley and one count of telephone harassment involving Erin Peterson. Prior to commencement of voir dire in the courtroom, the trial judge informed the parties that 11 potential jurors had failed to appear and 2 had been excused.

The jury found McClure guilty as charged of felony harassment, threat to kill, and not guilty of telephone harassment. The court imposed a three month standard range term.

## DECISION

McClure contends that his right to a public trial was violated when two jurors were excused outside of the courtroom before voir dire. He also maintains that he had a constitutional right to be present at the excusal proceeding.

A criminal defendant has a right to a public trial under both the state and federal constitutions. State v. Lormor, 172 Wn.2d 85, 90-91, 257 P.3d 624 (2011); see U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. But "'[n]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public.'" State v. Koss, ___ Wn.2d ___, 334 P.3d 1042, 1045 (2014) (quoting State v. Sublett, 176 Wn.2d 58, 71, 292 P.3d 715 (2012)). Before determining whether a public trial violation occurred, an appellate court first considers "whether the proceeding at issue was one to which the constitutional right to a public trial attaches." Id.

The court addressed an essentially identical issue in State v. Wilson, 174 Wn. App. 328, 298 P.3d 148 (2013). In Wilson, the bailiff excused two jurors for illness before voir dire began in the courtroom. Id. at 332. The excusal was in accordance with the trial court's written policy, which allowed administrative staff "to excuse jurors pretrial for illness-related reasons, and rescheduled them for jury service at a later date." Id. On appeal, Wilson argued that the excusals violated his right to a public trial and his right to be present at all crucial proceedings. Id. at 333. After examining the claims in light of the "experience and logic" test, the court disagreed. Id. at 337.

Under the "experience" prong, the court noted that no Washington decision has held that preliminary juror excusals for hardships have historically been open to

the public. Id. at 342. Nor has a court held that the public trial right implicates any component of jury selection "that does not involve 'voir dire' or a similar jury selection proceeding involving the exercise of 'peremptory' challenges and 'for cause' juror excusals." Id. In general, the trial court and its delegated agents retain broad discretion to excuse jurors for administrative or hardship reasons outside of the courtroom "provided that the excusals are not the equivalent of peremptory or for cause juror challenges." Id. at 344; see also RCW 2.36.100(1); CrR 6.3; State v. Rice, 120 Wn.2d 549, 561-62, 844 P.2d 416 (1993).

Under the "logic" prong, the Wilson court found no showing that public access played "'a significant positive role'" in pre voir dire juror excusals for hardships. 174 Wn. App. at 346 (quoting Sublett, 176 Wn.2d at 73). Moreover, because the bailiff had broad discretion to excuse jury pool members for "hardship" and other reasons, openness during the pre voir dire excusal proceeding would not have "'enhance[d] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.'" Id. (alteration in original) (quoting Sublett, 176 Wn.2d at 75). The court concluded that the bailiff's administrative excusal of two jurors for illness did not implicate Wilson's public trial right and no courtroom closure occurred. Id. at 347.

The court also rejected Wilson's claim that he had a constitutional right to be present during such proceedings. Id. at 350. The court noted that the excusals were not based on any circumstances related to Wilson personally or to the issues in his case. Id. Moreover, there was no showing that his presence bore any "'relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the

-7-

charge'" or "'that a fair and just hearing would be thwarted by his absence.'" Id. (quoting State v. Irby, 170 Wn.2d 874, 881, 246 P.3d 796 (2011)).

Nothing in the record suggests that the excusals here were related to McClure personally or to the circumstances of his case or that they involved any error or abuse of discretion. Under Wilson, McClure fails to demonstrate that the excusals prior to the venire being presented for voir dire violated his public trial right or right to be present.

McClure contends that, unlike Wilson, the record here fails to reveal who excused the jurors, when the excusals occurred, and the reason for the excusals. Although true, these contentions are also fatal to McClure's claim of error. Generally, the trial court bears the burden of making a record demonstrating the proper procedures for closing a court proceeding to which the open trial right attaches. Koss, 334 P.3d at 1047. But the appellant "bears the responsibility to provide a record showing that such a closure occurred in the first place." Id. (appellant failed to show that courtroom closure occurred during proceedings related to jury questions). The trial court informed the parties before voir dire began that there were 11 "no-shows" and "two excuses." McClure did not object or request any further explanation. Under the circumstances, he cannot demonstrate a courtroom closure or trial court error related to the administrative juror excusals.

McClure also contends the evidence was insufficient to support his harassment conviction. He argues that a reasonable person in McClure's position would not foresee that such enigmatic remarks would be interpreted as a serious expression of an intent to kill Ms. Hawley and that the State therefore failed to prove

a "true threat." He also claims that the evidence failed to establish that Ms. Hawley reasonably feared he would carry out the threat to kill her. Evidence is sufficient if, when viewed in a light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

In order to convict McClure of harassment as charged, the State was required to prove, among other things, that he knowingly threatened to kill Ms. Hawley and that his words placed her "in reasonable fear that the threat to kill would be carried out." See RCW 9A.46.020(1), (2). To avoid violating the First Amendment, a statute criminalizing threatening language must also be construed "as proscribing only unprotected true threats." State v. Allen, 176 Wn.2d 611, 626, 294 P.3d 679 (2013). Here, the trial court instructed the jury that

> [t]o be a threat, a statement or act must occur in a context or under such circumstances where a reasonable person, in the position of the speaker, would foresee that the statement or act would be interpreted as a serious expression of intention to carry out the threat rather than as something said in jest or idle talk.

Even if couched in the language of threats, communications are not true threats if they are in fact "merely jokes, idle talk, or hyperbole." State v. Schaler, 169 Wn.2d 274, 283, 236 P.3d 858 (2010). The existence of a true threat does not depend on the subjective intent of the speaker. See State v. Kilburn, 151 Wn.2d 36, 48, 84 P.3d 1215 (2004). "It is enough that a reasonable speaker would foresee that the threat would be considered serious." Schaler, 169 Wn.2d at 283.

Immediately after Lt. Hawley told him that he would be arrested if he placed any more unnecessary calls to the dispatch center, McClure called the center with "a

-9-

message for whoever the senior bastard is, you have a Hawley that used to be sheriff." He referenced his past service on Navy "gun ships" and then told the dispatcher that "the Admiral" wanted "Mike Hawley" to become a "smoking hole" and said, "Now, go get 'em." McClure, who lived on Barque Road, then announced that the "U.S.S. Barque Road is ready for combat" and "when I blast, there's nothing left." "I'll take out that filbert or walnut farm, his wife, his kids. And you know what? I'll feel no sorrow tomorrow."

McClure underscored his intention and threats to blast a "smoking hole" and to "take out" Hawley's farm and family through specific references to Hawley, to the location of Hawley's personal residence, to private details of Hawley's residence and property, and to his military service. See State v. Locke, 175 Wn. App. 779, 793, 307 P.3d 771 (2013) ("menace of the communication . . . further heightened by its specificity"), review denied, ___ Wn.2d ___, ___ P.3d ___ (2014). McClure had no preexisting amicable relationship or communications with the Hawleys from which he could reasonably expect that they would not take his statements seriously. See Kilburn, 151 Wn.2d at 39. When Lt. Hawley investigated a similar series of calls in 2008, he had removed firearms from McClure's home. McClure had recently resumed the calls and appeared to be escalating his conduct.

Under the circumstances, a reasonable person in McClure's position would foresee that his statements would be interpreted as a serious expression of an intent to carry out the threat. The evidence was sufficient to establish a true threat.

McClure's communication also encompassed a specific threat to "take out" Lt. Hawley's wife. Ms. Hawley testified that she was away from the house on a business

trip when her husband called and told her "that my life and his life and our children's li[ves were] threatened." This was the first time he had informed her about a specific threat to her life. She recognized that her husband believed the threat was "very serious" and "credible," and she became very upset. Lt. Hawley also told her about McClure's frequent calls to the dispatch center, the suspicious package that he left, and his personal reference to the family's nut farm. Upon returning home, she immediately took additional safety precautions, including no longer taking walks outside in the field or walking the dogs in the orchard. She also obtained a concealed weapons permit.

Contrary to McClure's suggestion, the evidence establishes more than a suspicion that he might do "something." Implicit in Ms. Hawley's words and actions is her belief that McClure had threatened to kill her. Viewed in the light most favorable to the State, the evidence was sufficient to establish that she reasonably believed he would carry out this threat.

Affirmed.

_Appelwick, J._

WE CONCUR:

_Leach, J._                                _Schindler, J._