46 P.3d 257 (2002)
111 Wash.App. 660
STATE of Washington, Respondent,
v.
William Bradley JACKSON, Appellant.
No. 19714-0-III.
Court of Appeals of Washington, Division 3, Panel Five.
May 9, 2002.
*260 Paul J. Wasson, Attorney at Law, Spokane, Counsel for Appellant.
Kevin M. Korsmo, Deputy Prosecuting Attorney, Spokane, Counsel for Respondent. *258

*259 OPINION PUBLISHED IN PART
BROWN, C.J.
William Bradley Jackson was convicted in Spokane County and given a 672-month exceptional sentence for the first degree murder of his 9-year-old daughter Valiree. Mr. Jackson seeks review of the trial court rulings (A) denying a venue change, (B) failing to suppress evidence derived from search warrants, (C) granting an exceptional sentence, and (D) denying his motion for a new trial.
For the first time, we review the use of a Global Positioning System (GPS) tracking device in the State of Washington. We hold that when the issuing judge approved search warrants for the installation of the GPS devices, the judge substantively deemed Mr. Jackson's privacy interest in his vehicles was, under these facts, insufficient as a matter of law to offend the Washington constitutional principles embodied in article I, section 7 or the federal constitutional principles discussed here. Because we also find no error in the other issues presented, we affirm.

FACTS
At 8:45 a.m. on October 18, 1999, Mr. Jackson called 911 to report his daughter Valiree missing from their residence in the Spokane Valley. Mr. Jackson then appeared to search for Valiree in the neighborhood, hollering her name and knocking on doors. Mr. Jackson went to Valiree's elementary school, appearing to look for her. To school employees and a crossing guard he looked distraught, nervous, and shaking. Immediately, some 44 volunteers joined sheriff's personnel and canine units in an extensive, but unsuccessful neighborhood search of about 120 homes.
Deputy Scott Nelson was first to respond to the Jackson residence, owned by Mr. Jackson's parents, Karen and Wilbur Jackson. Mr. Jackson and Valiree had moved in *261 seven months before from the Deer Park home of Mr. Jackson's girlfriend Danette Schroeder. Karen Jackson told Deputy Nelson she and her husband had left for work early that morning and Mr. Jackson would have been alone with Valiree after 4:30 a.m. Valiree was fine when they left.
Mr. Jackson told Deputy Nelson, and later Detective Dave Madsen, he had last seen Valiree at 8:15 a.m. in the front yard. She was not there when he went outside at 8:30 a.m. to take her to school, although her school backpack was on the front porch. After checking to see if neighbors, the crossing guard or school personnel had seen her, he returned home to call the police. He told Detective Madsen Valiree had had a bloody nose during the night, so he washed her pillowcases that morning. Detective Madsen saw blood stains on Valiree's pillow and faded blood on her bed sheet, but found no evidence of items used to stop a nosebleed. With permission, Detective Madsen took the pillow and bedding for examination.
On October 20, Detective Madsen told Mr. Jackson the three possibilities being investigated were abduction by a stranger; abduction by Valiree's mother Roseanne Stone, who had been missing for seven years; or, removal by a member of the Jackson household. Detective Madsen told Mr. Jackson that since his parents were accounted for, the third possibility pointed toward him.
On October 23, Detective Madsen applied for and executed a search warrant (warrant # 1) for the Jackson home, a 1995 Ford pickup, and a 1985 Honda Accord parked at the home on the morning of Valiree's disappearance. Valiree's diary recovered from her bedroom contained an entry dated October 12, 1999, indicating her father would not leave her alone in her room. The two vehicles were impounded and searched without finding incriminating evidence. After testing the wash cycles, Detective Madsen thought Mr. Jackson's explanations about doing the laundry on the morning of Valiree's disappearance did not add up.
On October 26, Detective Dave Knechtel applied for and received a 10-day warrant (warrant # 2) to attach GPS tracking devices to the 1995 Ford pickup and 1985 Honda Accord while they remained in police impound. Detective Donald McCabe installed the devices to the vehicles' 12-volt electrical systems on October 26 and 27 without Mr. Jackson's knowledge, and the vehicles were returned to him. The position of the vehicles could be precisely tracked every five seconds and become known upon device recovery and computer analysis.
Detective Madsen then told Mr. Jackson he knew he had buried Valiree without sufficient time to keep animals from digging her up, and the body would be found to provide evidence to convict him. Thereafter, before warrant # 2 expired, Detective Knechtel obtained an additional 10-day warrant (warrant # 3) to maintain the GPS devices on the vehicles until November 14.
The GPS analysis for the morning of November 6 showed Mr. Jackson's truck traveled to his nearby mini-storage unit, then along highway 2 to Newport for a brief stop before noon. Next, after a short noon-time stop at Ms. Schroeder's Deer Park home, the vehicle traveled highway 395 to the Loon Lake area before turning onto an unmarked logging road on State land off the Springdale-Hunters highway and stopping on public land (the Springdale site). There, the vehicle remained stationery for approximately 44 minutes before first returning briefly to the Schroeder residence and then back to the Jackson home at 3:50 p.m. Jackson family members had long used the remote, hilly, thickly forested Springdale site as a secret hunting spot.
On November 10, the GPS recorded Mr. Jackson's truck leaving the Jackson home at about 1:07 p.m. and arriving about 20 minutes later at the "Vicari" site south of the Spokane Valley. The truck stopped for about 16 minutes and then traveled about 50 miles to the Springdale site where it remained stationery for about 30 minutes. Next, after stops at the Schroeder residence and other locations, the vehicle stopped at the mini-storage unit for 5 minutes, before returning to the Jackson home.
As a result of the GPS information, investigators found evidence at both sites. At the Vicari site, officers recovered dirt samples *262 and two plastic grocery bags with duct tape containing blood and hair, which DNA analysis matched with Valiree. Fingerprints on the grocery bags and the duct tape pointed to Mr. Jackson. At the Springdale site, investigators found Valiree's body in a shallow grave. Tire tracks linked Mr. Jackson to the Springdale site. Soil samples from both sites matched soil discovered in the bed of Mr. Jackson's pickup truck and on his boots and shovels. A roll of duct tape later seized from the Jackson residence showed a fracture match between the last piece on the roll and a piece found at the Vicari site.
On November 13, after Mr. Jackson visited his mini-storage unit, he borrowed Kelly and Sean Bash's blue and white pickup truck. Mr. Jackson was then carrying a welding mask and told Ms. Bash he had a job to finish. Soon, hunters saw Mr. Jackson in a pickup near the guarded Springdale gravesite. Ms. Schroeder testified Mr. Jackson later stopped at her house in a blue and white pickup and told her he had borrowed the truck because he knew he was being followed. When Mr. Jackson returned the pickup he left behind his shovel. That evening acting on an arrest request, Spokane police stopped Mr. Jackson while driving. Because Mr. Jackson carried a shotgun and acted suicidal, he was hospitalized until later released and charged with Valiree's murder.
According to Dr. George Lindholm, medical examiner, Valiree died due to homicide by asphyxia mechanism. Blood and liver tests did reveal the presence of the antidepressant drug "Paxil" in Valiree's system, which had been prescribed by her pediatrician. Although the medical examiner and other experts concluded the amounts of Paxil in Valiree's blood and liver samples were many times below lethal levels and did not cause her death, Mr. Jackson relied upon a Paxil overdose defense.
The State presented substantial evidence suggesting Mr. Jackson's motive for murder was so he could marry Ms. Schroeder without having Valiree involved in the relationship. Considerable tension had also developed between Ms. Schroeder and Karen Jackson over the parenting of Valiree, who was undergoing counseling for depression at Ms. Schroeder's suggestion. Mr. Jackson once told his sister that he wanted to marry Ms. Schroeder and that they would be together if it weren't for his mother and Valiree. Valiree refused to go to church with her father and Ms. Schroeder on October 17, the day before she disappeared. Both of Mr. Jackson's parents noticed this upset him. Mr. Jackson made marriage proposals to Ms. Schroeder after his arrest.
Near the time of his arrest, Mr. Jackson contrived a story about a new potential hunting buddy "Craig" who he said may have taken Valiree. The State introduced into evidence a May 3, 2000 letter from Mr. Jackson to his mother detailing a lengthy story that "Craig" had killed Valiree and shown him where the grave was located. In a subsequent letter to his parents on July 14, he admitted to making up the "Craig" story, but insisted he did not kill Valiree. At trial, Mr. Jackson again admitted making up the "Craig" story and offered the Paxil overdose defense, including explanations for the State's incriminating evidence.
The jury found Mr. Jackson guilty of first degree murder. After denying Mr. Jackson's motion for new trial, the court imposed a 672-month exceptional sentence based upon aggravating factors that (1) Valiree was particularly vulnerable at the time her father murdered her in her sleep; (2) Mr. Jackson violated his position of trust inherent in his parental role; (3) he engaged in concealment of the crime beyond that normally associated with murder; and (4) impact of the crime on McDonald Elementary students and the community as a whole. Mr. Jackson appeals.

ANALYSIS

A. VENUE
The issue is whether the trial court erred by abusing its discretion when denying Mr. Jackson's motions for change of venue due to extensive pretrial publicity.
A trial court's ruling on a motion for change of venue is discretionary and will be overturned solely for abuse. State v. Hoffman, 116 Wash.2d 51, 71, 804 P.2d 577 (1991). A court abuses its discretion when it *263 is exercised in a manifestly unreasonable manner or on untenable grounds. State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). The due process guaranty of a fair and impartial trial requires a change of venue motion be granted when the defendant shows a probability of unfairness or prejudice from pretrial publicity. Hoffman, 116 Wash.2d at 71, 804 P.2d 577. Pretrial publicity alone is thus not a sufficient reason to change venue. State v. Laureano, 101 Wash.2d 745, 682 P.2d 889 (1984), overruled on other grounds by State v. Brown, 111 Wash.2d 124, 761 P.2d 588, adhered to on reh'g, 113 Wash.2d 520, 782 P.2d 1013, 787 P.2d 906 (1989).
To aid in determining whether the trial court abused its discretion in denying the venue change, we consider the Crudup factors:
(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.
State v. Crudup, 11 Wash.App. 583, 587, 524 P.2d 479 (1974).
Regarding the first Crudup factor, Mr. Jackson points to ongoing sensational media coverage characterized as going beyond the facts and circumstances of the case to the point of assuming his guilt. Considerable media coverage existed reporting the facts of the case as they developed, including accounts of Valiree's disappearance, family and community efforts to locate her, police tracking of Mr. Jackson to Valiree's gravesites, and the filing of murder charges against him. The court noted the ongoing publicity including print, electronic, and Internet media "has been both news being reported as well as having a component to it of a presumption of guilt on behalf of the arrested party." Report of Proceedings (RP) at 1661-62.
Mr. Jackson points to coverage from local television stations and The Spokesman-Review (including its Internet articles) in October through December 1999 connecting him to the unexplained 1992 disappearance of Valiree's mother, Roseanne Stone. Some coverage inferred Mr. Jackson might have killed her. Two articles discuss possible connections with the Spokane serial killer case. Other articles suggested Mr. Jackson had sexually abused Valiree. A November 1999 article in The Spokesman-Review mentioned his prior conviction for third degree theft. Several newspaper articles in late 1999 included Mr. Jackson's name in discussing other recent Spokane-area cases of parents killing their children.
In August 2000, a retired police officer's guest editorial in The Spokesman-Review criticized the Jackson defense for attacking a search warrant. On August 30, an article in the on-line edition of a weekly Spokane newspaper, The Local Planet, alleged Mr. Jackson had a history of drug abuse and that the State could have sought the death penalty for murdering Valiree to cover up possible sexual abuse. That day, Mr. Jackson unsuccessfully moved for a change of venue.
On September 1, the venire was sworn. Two days later, The Spokesman-Review printed a front-page headline article entitled, "Would Father Kill Daughter For Love?" Clerk's Papers (CP) at 412. Additionally, the connected article discussed Mr. Jackson working as a stripper, his possible connection with the disappearance of Valiree's mother Roseanne Stone, his alleged uncontrollable temper, and his alleged drug use. The article's theme was a killing out of obsessive love for Ms. Schroeder. This article generated an additional unsuccessful change of venue motion on September 5. Individual voir dire of jurors began on September 7.
Given these facts, media coverage exceeded the factual boundaries of the case. Thus, the first Crudup factor supports a venue change.
*264 Regarding the second Crudup factor, the degree of publicity was significant. The publicity was published in print and Internet stories by The Spokesman Review, the major Spokane County and regional newspaper with a daily circulation exceeding 140,000 copies. The court noted the publicity pervaded the community in the form of video, pictures and fliers. A vast majority of the 143 jurors actually called knew of the case. Even though the degree of publicity was significant, a venue change does not invariably follow. See State v. Rice, 120 Wash.2d 549, 557, 844 P.2d 416 (1993) (nearly all of 153 prospective jurors were aware of case).
Regarding the third Crudup factor, the initial publicity peak occurred in October through December 1999 when Valiree disappeared and when Mr. Jackson was arrested. As the court noted, publicity again surged near jury selection and trial. Foremost is the September 3 article in The Spokesman-Review article. No empaneled juror expressed knowledge or influence from media accounts following empanelment. Because the publicity known to jurors mainly occurred in late 1999, this venue change factor is relatively neutral. See State v. Jeffries, 105 Wash.2d 398, 409, 717 P.2d 722 (six months between murders and trial sufficient), cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 301 (1986).
The fourth Crudup factor, from Mr. Jackson's view, best supports his venue change arguments because of the difficulty of jury selection. Nearly two-thirds of all the prospective jurors examined were excused for cause. Others were challenged for cause but kept on the general panel for later voir dire. On the other hand, the record shows great care was exercised.
Mr. Jackson suggests the level of adverse pretrial publicity was such that the court should have preemptively presumed bias before voir dire. Rideau v. Louisiana, 373 U.S. 723, 725-26, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (denial of a motion to change venue violated the due process clause when the defendant's confession was televised in the community and seen by three jurors who ultimately decided the case). The facts of Rideau are not found here. And, in Rideau the court reasoned prejudice is presumed solely in extreme situations when the record demonstrates the community has been saturated with inflammatory and prejudicial media coverage about the crime. Id. at 726-27, 83 S.Ct. 1417.
Here, the court decided to test the saturation level of the publicity by first conducting individual voir dire of all jurors who had heard about the case to ascertain bias and prejudice. This was a tenable exercise of discretion, considering that "the best test of whether an impartial jury could be empaneled [is] to attempt to empanel one." Hoffman, 116 Wash.2d at 72-73, 804 P.2d 577. The venue motion may then be renewed and granted if appropriate. Id. Mr. Jackson renewed his motion at least four times.
The judge instructed the venire to avoid current media coverage or discussions about the case. The court asked each juror during individual voir dire whether the admonition was followed. Except for jurors admittedly biased in favor of guilt and dismissed outright, the defense was allowed to thoroughly question each individual in camera. Approximately 85 of the 143 jurors actually called in for the case were excused for cause during individual voir dire, with some 53 of those primarily due to pretrial publicity or personal knowledge about the case. The rest were excused mainly for personal reasons or hardship. The court did deny defense challenges of approximately 22 additional jurors for cause, including 8 of the 12 who ultimately decided the case.
The court's care and concern is reflected in its comments at the close of several days of individual in camera voir dire:
We're going to go through a [general] voir dire process tomorrow. We're going to bring these people back in. We're going to take a shot at this and see what happens. Let's see if we can come up with a panel. If we can't, we're going to go to Seattle on Friday....
RP at 1503. It was by then clear the media coverage had not approached the inflammatory level of Rideau or Mr. Jackson's other cited case, Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *265 Sheppard, unlike here, a new trial was granted after sensational inherently prejudicial publicity saturated the community influencing jurors, which included calling the defendant a liar and an inquest broadcast from a school gymnasium where the defendant was publicly searched by police, then questioned without full assistance of counsel.
The defense challenged 8 of the final 12 jurors and 1 of the 2 alternates for cause during individual voir dire, but did not again challenge those individuals. Four seated jurors were never challenged for cause, three apparently having no knowledge of the case. In general voir dire, the 12 jurors and 2 alternates appear to have been chosen without significant difficulty. The defense, after inquiry, declined to request extra peremptory challenges. After jury selection, the court again strongly and repeatedly admonished against all discussion and media publicity about the case.
In sum, Mr. Jackson correctly identifies this factor as closer than the other Crudup factors. But, we conclude the trial court's exceptional care offset the difficulties presented in final jury selection.
Regarding the fifth Crudup factor, Mr. Jackson argues nearly all jurors had knowledge of the facts and some believed he was guilty. But the fact that a majority of the prospective jurors had knowledge of the case, without more, is irrelevant. Rice, 120 Wash.2d at 558, 844 P.2d 416. Critical is whether the jurors had such fixed opinions that they could not be impartial. Id. All jurors perceived as such were dismissed during individual voir dire, but for one juror who was dismissed for cause after general voir dire for stating she expected Mr. Jackson to take the stand and defend himself.
Two jurors were, by agreement, dismissed for cause prior to general voir dire because of knowledge of inadmissible evidence revealed in individual voir dire to avoid the problem in State v. Stackhouse, 90 Wash. App. 344, 352, 957 P.2d 218 (1998). In Stackhouse, a new trial was ordered because two empanelled jurors knew about prior murder charges the defendant had faced. Here, the record reveals great care to avoid the Stackhouse problem by dismissing possibly affected jurors.
Mr. Jackson points to no seated juror with a fixed opinion impacting impartiality. He does not assign error to any of the court's specific denials of his challenges for cause. See State v. Rupe, 108 Wash.2d 734, 748-49, 743 P.2d 210 (1987) (denying a cause challenge is discretionary with trial court, and will be reversed only for manifest abuse). Moreover, the record regarding the final jurors shows all appeared impartial and none expressed influence from prejudicial media information or knowledge of inadmissible evidence.
In these circumstances, Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), cited by Mr. Jackson for the proposition that the adverse pretrial publicity was such that juror claims of impartiality should not be believed, is not controlling. See State v. Brett, 126 Wash.2d 136, 158, 892 P.2d 29 (1995) (trial judge is in best position to determine if a particular juror would be impartial). Furthermore, in denying Mr. Jackson's motion for new trial after sentencing, the court expressly noted it had observed not only what each juror had to say on individual voir dire, but also observed their individual circumstances, body language and reactions to determine whether there was good reason to excuse them.
In sum, the court was satisfied those remaining were qualified jurors and a venue change was not required. We agree with the trial court.
The Sixth Crudup factor focuses on the challenges exercised by the defendant. Mr. Jackson did exercise all six of his peremptory challenges. But, he does not identify any specific seated juror as biased and the record discloses none. "`So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.'" State v. Roberts, 142 Wash.2d 471, 518, 14 P.3d 713 (2000) (quoting Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)).
The seventh Crudup factor examines the government's connection to the publicity.
*266 Mr. Jackson alleges no governmental connection to the publicity. The trial court was not made aware of any inflammatory remarks attributable to government officials. The record shows none. This factor does not support a change of venue.
Eighth, regarding severity, Mr. Jackson was charged with first degree murder, the second most severe crime in Washington next to aggravated first degree murder. This factor favors a change of venue.
Finally, under Crudup, we examine the size of the area from which the jurors were drawn. Spokane County is one of the State's largest counties. Even so, Mr. Jackson contends The Spokesman Review permeated all corners of the county with prejudicial pretrial publicity, especially as to the GPS tracking device. Denials of change of venue motions have previously been upheld where the venire was drawn from areas smaller than Spokane County. See Rice, 120 Wash.2d at 559, 844 P.2d 416 (Yakima County 73,148 registered voters); Rupe, 108 Wash.2d at 753, 743 P.2d 210 (Thurston County 61,000 registered voters); Jeffries, 105 Wash.2d at 409, 717 P.2d 722 (Clallam County 50,000 registered voters). The GPS evidence is unique, but the record shows no seated juror was predisposed by it to find Mr. Jackson guilty. Accordingly, this Crudup factor does not favor a venue change.
Although some Crudup factors do support a venue change, on balance the court did not abuse its discretion in finally denying Mr. Jackson's motions for change of venue. This case is akin to Rice in that the record shows no juror who, despite case knowledge, had such fixed opinions that they could not act impartially. Rice, 120 Wash.2d at 558, 844 P.2d 416. Mr. Jackson shows no probability of unfairness or prejudice from pretrial publicity. Hoffman, 116 Wash.2d at 71, 804 P.2d 577.

B. SEARCH WARRANTS
The general issue is whether the trial court erred when refusing to suppress evidence derived from the search warrants issued here. First, we examine warrant # 1 specifically regarding probable cause and whether untruthful statements were used when seeking the warrant. Next, to the extent necessary after resolving the threshold issues, we review warrant # 2 and warrant # 3, which authorized the use of the GPS tracking devices. Last, we briefly address warrant # 7 regarding the issuing magistrate.

1. Standard of Review
A search warrant may issue solely upon probable cause. State v. Cole, 128 Wash.2d 262, 286, 906 P.2d 925 (1995). Probable cause exists if the supporting affidavit sets forth facts sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and evidence of the crime can be found at the place to be searched. Id. State v. Cord, 103 Wash.2d 361, 365-66, 693 P.2d 81 (1985). Specific facts must establish a nexus between items to be seized and the place to be searched. State v. Thein, 138 Wash.2d 133, 140, 977 P.2d 582 (1999). We review a search warrant for abuse of discretion, giving great deference to the issuing magistrate and resolving doubts in favor of the warrant. In re Pers. Restraint of Yim, 139 Wash.2d 581, 595, 989 P.2d 512 (1999).
If a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.
Franks v. Delaware, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Franks test applies equally to alleged material omissions. State v. Garrison, 118 Wash.2d 870, 872, 827 P.2d 1388 (1992).
Allegations of negligence or innocent mistake are insufficient; allegations must exist of deliberate falsehood or omission or of a reckless disregard for the truth. Franks, 438 U.S. at 171, 98 S.Ct. 2674; Garrison, 118 Wash.2d at 872, 827 P.2d 1388. Allegations must be accompanied by an offer of proof. Garrison, 118 Wash.2d at 872, 827 P.2d 1388. If these requirements are not met the inquiry *267 ends. If they are met, and the false representation or omitted material is relevant to establishment of probable cause, the affidavit must be examined.
Relevant false representations are set aside and deliberate or reckless omissions are inserted into the affidavit. Then, if the affidavit with the appropriate matter inserted or deleted remains sufficient to support a finding of probable cause, the suppression motion fails and no hearing is required. Only if the altered content is insufficient to establish probable cause is the defendant entitled to an evidentiary hearing. Garrison, 118 Wash.2d at 873, 827 P.2d 1388 (citing Franks, 438 U.S. at 171-72, 98 S.Ct. 2674).

2. Warrant # 1, Residence and Vehicles
District Court Judge Madden approved Detective Madsen's application for warrant # 1 to search Mr. Jackson's home and two vehicles for blood, hairs, fibers, fluids and any other evidence pertaining to Valiree's disappearance. Mr. Jackson generally challenges this warrant as not supported by probable cause. Further, Mr. Jackson broadly asserts the trial court erred in refusing his request for a Franks hearing, but does not specifically challenge any of the reasons given. The trial court ruled Mr. Jackson failed to prove the following summarized allegations of intentional falsehoods or omissions in Detective Madsen's affidavit; or, that they were ultimately material to probable cause even if redacted or included:
1. Deputy Nelson, who was first on the scene at the Jackson home, would testify that the residence was neat and tidy with no sign of a struggle. Detective Madsen omitted this fact. The court ruled this fact immaterial to probable cause even if included in the affidavit.
2. Deputy Nelson would testify that upon arrival at the residence he did not observe whether either vehicle in the driveway had been recently driven. He did not check either vehicle for a warm engine or lack of heavy dew. Karen Jackson would testify that before Detective Madsen applied for the warrant, she told him both vehicles were covered in heavy dew early that morning. Detective Madsen omitted these facts. The court ruled the defense made no showing this omission was intentional. The court also considered it immaterial because whether there was dew on the cars at the relevant time was never established and thus could not be further addressed in a Franks hearing.
3. Mr. Jackson would show through the testimony of several witnesses that Detective Madsen intentionally concealed that Valiree was of mixed race (a white father with red hair and an African-American mother) and that the alleged red pubic hair found in the bed sheets could thus have been confused with curly red head hair. The court ruled that although the affidavit did not state Valiree was of mixed race, there is no showing the omission was intentional or that the child's red curly hair would in any way resemble pubic hair.
4. Forensic hair examiner Kevin Jenkins would testify he found only two pubic hairs in the bed sheets. It was therefore intentionally misleading for Detective Madsen to state Mr. Jenkins found "multiple" pubic hairs. The court ruled this was not a misrepresentation because "two" is "multiple."
5. Dr. Holden would testify that he told Detective Madsen Valiree had not yet developed pubic hair as of July 1999, making it a misrepresentation for Detective Madsen to state she did not have pubic hair as of October 1999. The court ruled that even though it was later learned the child apparently had developed pubic hair by October, Detective Madsen's statement was not a misrepresentation of what he knew at the time.
6. Dr. Holden would also testify he told Detective Madsen he had never observed signs that Valiree had been abused or neglected. Karen Jackson would give similar testimony. The court did not address this allegation, but these facts would be immaterial to probable cause even if added to the affidavit.
7. Spokane Police Officer Kendal would testify that Katherine Stone, the sister of Valiree's mother Roseanne, Stone, said she believed Roseanne took Valiree due to bitterness over losing custody of her to Mr.

*268 Jackson. Mr. Jackson alleged this material omission was extremely relevant given that Detective Madsen considered him the sole suspect. The court ruled that the opinions and theories of a relative are not material. And even if included in the affidavit, that information would not vitiate probable cause as it relates to Mr. Jackson.
See CP at 275-76.
While Mr. Jackson's failure to challenge any of the court's particular reasons for denying his requested Franks hearing is fatal, the record discloses no error in any event. All considered, Detective Madsen's affidavit would still state that Mr. Jackson reported his 9-year-old daughter missing from the family residence. Blood was found on her pillow and bed sheet. More than one pubic hair was located in her bed sheets. No one heard screams or saw the child between 4:30 and 8:30 a.m. Her backpack was discovered at the residence. Mr. Jackson was the sole person at the home during her disappearance and he had access to two vehicles. These facts establish probable cause to believe evidence of a crime would be found in the residence and/or in vehicles accessible to Mr. Jackson.
In sum, the court correctly determined a Franks hearing was not required. The October 23 warrant # 1 to search the Jackson home and seize and search Mr. Jackson's vehicles was supported by probable cause. The court did not abuse its discretion in issuing it. Cole, 128 Wash.2d 262, 906 P.2d 925; Yim, 139 Wash.2d 581, 989 P.2d 512.

3. Warrants # 2 and # 3, GPS Tracking Devices Mr. Jackson's presented issues are summarized as whether the trial court erred in upholding warrants # 2 and # 3 regarding the GPS tracking devices by incorrectly deciding probable cause existed or without first holding Franks hearings. Below, the State's law enforcement agencies applied for probable cause determinations before attaching the GPS devices to Mr. Jackson's vehicles. The motions judge upheld the warrants on that basis, thus bypassing both the State's contention no warrant was required anyway under the Fourth Amendment, and Mr. Jackson's counter-argument that GPS installation and monitoring invaded his privacy rights under article I, section 7 of the Washington Constitution.
Now, as a threshold contention on appeal, and mainly relying on the cases it cited below, United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) and United States v. McIver, 186 F.3d 1119, 1126-27 (1999), cert. denied, 528 U.S. 1177, 120 S.Ct. 1210, 145 L.Ed.2d 1111 (2000), the State frames the dispositive issue as whether any probable cause obligation exists under the particular circumstances here because a GPS device merely records information already open to public view. Further, citing State v. Young, 123 Wash.2d 173, 182, 867 P.2d 593 (1994), it argues Washington law is consistent for the proposition that events occurring in public places are not private affairs safeguarded from governmental trespass by article I, section 7 of the Washington Constitution. In sum, the State reasons Mr. Jackson's focus on probable cause is misplaced because probable cause is not relevant.
Whether a warrant is required for GPS installation and tracking is a question of first impression in Washington. Our review is de novo. State v. Johnson, 96 Wash.App. 813, 816, 981 P.2d 25 (1999) (the choice, interpretation, and application of law are matters of law reviewed de novo). Mindful of the six factors enunciated in State v. Gunwall, 106 Wash.2d 54, 61-62, 720 P.2d 808 (1986), we follow suit from Young, 123 Wash.2d at 178-81, 867 P.2d 593, and recognize heightened privacy protections of CONST. art. I, § 7 over those of the Fourth Amendment in the context of police use of sense enhancement devices. We thus analyze this matter first under the Washington Constitution. See Seattle v. Mesiani, 110 Wash.2d 454, 456, 755 P.2d 775 (1988).
Article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The constitution thus protects both a person's home and private affairs from warrantless *269 searches. Young, 123 Wash.2d at 181, 867 P.2d 593. The relevant inquiry in determining whether a search occurred is "`whether the State has unreasonably intruded into a person's `private affairs'.'" Id. (quoting State v. Boland, 115 Wash.2d 571, 577, 800 P.2d 1112 (1990)). If no search occurs, then article I, section 7 is not implicated.
The "private affairs" inquiry includes, but is broader than, the Fourth Amendment's subjective and reasonable expectation of privacy standard. Katz v. United States, 389 U.S. 347, 351-52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Goucher, 124 Wash.2d 778, 782, 881 P.2d 210 (1994). The Washington constitutional focus is on "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." Myrick, 102 Wash.2d at 511, 688 P.2d 151.
Next, we apply the private affairs analysis in the context of the State's argument. We view the submission of warrant # 2 to the issuing judge as effectively asking the court to rule on the propriety of placing the GPS devices. Thus viewed, it was a prudent request for a prior judicial determination of whether Mr. Jackson's privacy interest in his vehicles was sufficient to be "safe from governmental trespass absent a warrant." State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984).
Nevertheless, we conclude the judicial officer's grant of probable cause for warrants # 2 and # 3, was ultimately unnecessary in this case to comport with our constitution.
Significantly, Mr. Jackson does not argue that any constitutional interest is offended other than the lack of probable cause for warrants # 2 and # 3. By limiting his focus to probable cause, Mr. Jackson more or less concedes the placement of the GPS devices did not then intrude into his private affairs by immediately collecting protected information. Moreover, warrant # 1 was already based upon sufficient probable cause to give officers lawful access to Mr. Jackson's vehicles when the GPS devices were placed, thus foreclosing potential interference issues. It was during this time that the State, exercising prudent caution, secured the prior judicial approval for the GPS installations. Thus, under these facts, the initial intrusion here was clearly not a "trespass" under the reasoning of Myrick; the principles established in CONST. art., § 7 are not offended by GPS installation. Mr. Jackson makes no claim to the contrary.
Next, it is fundamental in Washington constitutional case law that "what is voluntarily exposed to the general public and observable without the use of enhancement devices from an unprotected area is not considered part of a person's private affairs." Young, 123 Wash.2d at 182, 867 P.2d 593. See also Goucher, 124 Wash.2d at 784, 881 P.2d 210 (same); State v. Rose, 128 Wash.2d 388, 400, 909 P.2d 280 (1996) (open view doctrine applies under state constitution); State v. Myers, 117 Wash.2d 332, 345, 815 P.2d 761 (1991) (detecting exposed object from nonintrusive vantage point is not a search).
Thus, for example, the use of sense-enhancing devices like binoculars does not constitute a particularly intrusive method of viewing so long as the object observed could have been seen with the naked eye had the officer been closer to it. Young, 123 Wash.2d at 183 n. 1, 867 P.2d 593 (citing State v. Manly, 85 Wash.2d 120, 124, 530 P.2d 306, cert. denied, 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 81 (1975); State v. Ludvik, 40 Wash.App. 257, 264 n. 1, 698 P.2d 1064 (1985)). Monitoring Mr. Jackson's public travels in his truck by use of the GPS device is reasonably viewed as merely sense augmenting, revealing open-view information of what might easily be seen from a lawful vantage point without such aids. See also Myrick, 102 Wash.2d at 514, 688 P.2d 151 (aerial surveillance of defendant's property with unaided eye from 1,500 above ground was not a search under CONST. art. I, § 7).
In other words, a law officer could legally follow Mr. Jackson's vehicles on public thoroughfares or see his travels from his home, to his mini-storage unit, and to the Vicari and Springdale sites. In another sense, the GPS devices made Mr. Jackson's vehicles visible or identifiable as though the officers had *270 merely cleaned his license plates, or unobtrusively marked his vehicles and made them plain to see. In any event, Mr. Jackson has no privacy interest in the Vicari or Springdale sites, so evidence collected at the sites is not otherwise objectionable. Evidence collected at the sites clearly supported probable cause for subsequent warrants.
Thus, this case is distinguishable from cases involving the warrantless use of technical aids or enhancement devices to unlawfully intrude upon private affairs. For example, in Young, (relied upon by Mr. Jackson in his trial court briefing) an infrared device enabling officers to detect heat distribution inside the defendant's home was deemed to go "well beyond an enhancement of natural senses." Young, 123 Wash.2d at 183, 867 P.2d 593. This was an invasion of the home for purposes of article I, section 7. Id. at 186, 867 P.2d 593. Mr. Jackson's case does not involve an invasion of the home or use of enhancements to monitor what could not already have been plainly seen by any member of the public.
Similarly, in State v. Kelly, 68 Haw. 213, 708 P.2d 820 (1985), cited to the trial court by Mr. Jackson for the proposition that state constitutions may be more protective than the federal constitution, officers intercepted from the mail a packaged photo album containing cocaine intended for the defendant and held the package for 10 days to install a beeper in the photo album. The beeper trace eventually led officers to arrest the defendant at his residence. The court held the warrantless seizure and unreasonable detention of the album for 10 days was a privacy invasion under the Hawaii constitution. Kelly is distinguishable" from Mr. Jackson's case, again, because his vehicle was already lawfully in police possession and subject to search pursuant to warrant # 1. And, police monitoring of the GPS did not exceed public boundaries.[1]
And, unlike pen registers and other electronic trap and trace devices, the Privacy Act requirements of consent or authorization do not apply to electronic signals from a tracking device, because no communication is involved. RCW 9.73.260(1)(b)(iii). Furthermore, Mr. Jackson's location is not a form of communication. Our Supreme Court has recently emphasized in a different context that a geographic location is not per se a communication. State v. Darden, 145 Wash.2d 612, 41 P.3d 1189, 1196 (2002).
Accordingly, under these facts, we hold that police use of the GPS devices did not offend the Washington Constitution because the State did not impermissibly intrude upon private affairs when attaching and monitoring the devices. Here, Mr. Jackson's privacy interests were ultimately insufficient to require warrants. Our holding does not state a blanket rule requiring prior judicial authorization in all cases. But, at the same time we emphasize the State may act at its peril by choosing not to do so depending upon the facts of each case. As was the case for recordings under chapter 9.73 RCW, policy decisions regarding rulemaking in the form of statutory controls for electronic tracking devices is best left to the Legislature.
Under federal constitutional principles founded in the Fourth Amendment, which generally are less protective than those founded under CONST. art. I, § 7, it is not surprising that the result would be the same. "A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." United States v. Knotts, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); McIver, 186 F.3d at 1126. The Fourth Amendment likewise does not prohibit use of scientific enhancements to augment sensory faculties used to observe what is already open to the public. Knotts, 460 U.S. at 282, 103 S.Ct. 1081. On the other hand, the Supreme Court concluded in United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), that "Indiscriminate *271 monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight." Id. at 716, 104 S.Ct. 3296. See generally 1 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 2.7(e), at 644-54; § 2.7(f), at 1-658-60 (3d ed.1996). See also 2 WAYNE R. LAFAVE, ET AL., CRIMINAL PROCEDURE § 3.2(j), at 77-82 (1999).
In Knotts, the warrantless placing of a "beeper" device into a chemical drum carried in the defendant's vehicle and police monitoring of the beeper signals was not a Fourth Amendment search or seizure when the drum was not monitored once it moved indoors. Knotts, 460 U.S. at 278-79, 103 S.Ct. 1081. The court considered the activity tantamount to "the following of an automobile on public streets and highways." Knotts, 460 U.S. at 281, 103 S.Ct. 1081. The beeper trace was not a search because a person has a lesser expectation of privacy in a car because "`it seldom serves as one's residence.'" Knotts, 460 U.S. at 281, 103 S.Ct. 1081 (quoting Cardwell v. Lewis, 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974)) (plurality opinion).
This latter concept likewise appears in Washington case law. See, e.g., State v. Patterson, 112 Wash.2d 731, 774 P.2d 10 (1989) (lesser expectation of privacy in vehicle because function is transportation and a vehicle is rarely used as residence or repository of personal effects). Here, Mr. Jackson did not use his vehicles as a residence. And moreover, he did not attempt to conceal his private property, i.e., the vehicles, from public view until after the crucial GPS monitoring was completed and he borrowed the Bash's truck instead of using his own.
In Karo, on the other hand, the court held that the monitoring of a beeper in a private residence not open to visual surveillance violated the Fourth Amendment rights of those with a justifiable interest in the privacy of the residence. Consequently, the court found no reason to deviate from the general rule that the search of a house should be conducted pursuant to a warrant. Karo, 468 U.S. at 718, 104 S.Ct. 3296. Here, Mr. Jackson's vehicles were not garaged or moved indoors; the monitoring disclosed only public locations and did not infringe upon the sanctity of protected areas. In this regard, Mr. Jackson's case falls within the ambit of Knotts, not Karo.
Similarly, in McIver, the defendant challenged police placement of electronic tracking devices on the undercarriage of his vehicle as an illegal search and seizure. The court first rejected the "search" argument on the basis no reasonable expectation of privacy under the Fourth Amendment exists in the exterior or undercarriage of a car thrust into the public eye. The defendant did not show he intended to preserve the undercarriage as private and free from warrantless government intrusion. McIver, 186 F.3d at 1127. Here, Mr. Jackson's vehicles were already subject to search under warrant # 1, thus excluding the place where the GPS devices were applied as private and free from warrantless intrusion.
The McIver court rejected the "seizure" argument on the basis the defendant failed to show the placement of the tracking devices deprived him of dominion and control over the vehicle so as to meaningfully interfere with his possessory interests. McIver, 186 F.3d at 1127 (citing Karo, 468 U.S. at 712-13, 104 S.Ct. 3296) (technical trespass in space occupied by beeper was not meaningful interference with possessory interest so as to constitute Fourth Amendment "seizure"). Here, the same is true. Indeed, Mr. Jackson's possessory interest was restored, no meaningful interference with use or possession is presented here.
Instead, Mr. Jackson argues the warrants lacked probable cause because without knowing if or where the vehicles are going to move, it is impossible to meet the Fourth Amendment requirement of particularly describing the things to be seized. State v. Perrone, 119 Wash.2d 538, 545, 834 P.2d 611 (1992). He dismisses the problem as just a general exploratory search to see what could be found after GPS download.
In this regard, Mr. Jackson well cites to Thein. There, the court decided affidavits containing generalizations about the common habits of drug dealers were alone insufficient *272 to support probable cause for a warrant to search the defendant's residence for drug evidence. State v. Thein, 138 Wash.2d 133, 150-51, 977 P.2d 582 (1999). The court said a contrary view "amounts to a generalized conclusion that drug dealers are likely to keep evidence of illegal drug dealing in their homes." Id. at 150, 977 P.2d 582.
The State's theory argued below and here is that probable cause for warrant # 2 was supported in combination by the initial probable cause supporting warrant # 1, and the alleged prospective proposition that criminals commonly return to the scene of their crimes. Thus, under this theory, Mr. Jackson was likely to return to the scene of his suspected crime. We reject such a notion as unfounded. Unlike here, the State's cited cases are in the context of circumstantial evidence to prove guilt based upon already completed returns to the scene. Nevertheless, as explained, the application of the GPS under these facts constitutes neither a search, nor a seizure, so Mr. Jackson's probable cause analysis is, in any event, of no avail.
Also consistent with our analysis is a recent case from California discussing Knotts and McIver and upholding the installation and use of a beeper device. People v. Zichwic, 94 Cal.App.4th 944, 955-56, 114 Cal. Rptr.2d 733 (6th Dist.2001). The Zichwic court partly reasoned a beeper did not obtain private information, just the defendant's movements. Id. at 953, 114 Cal.Rptr.2d 733. The Zichwic court approved the attachment process so long as accomplished "from a place where the officer has a right to be." Id. at 956, 114 Cal.Rptr.2d 733. See also Osbourne v. State, ___ Nev. ___, 44 P.3d 523 (Nev.2002) (following McIver to hold that warrantless attachment of electronic monitoring device to bumper of defendant's truck not unreasonable search under Nevada Constitution).
Overall, in view of our analysis of warrant # 1, the officers here had a right of access to Mr. Jackson's vehicles when the devices were placed. No private information was thereafter obtained. Under the facts, we find no Fourth Amendment violation in the State's employment of the GPS devices to track Mr. Jackson's vehicles.[2]
In sum, no search warrant was required under the state or federal constitution to use the GPS devices here. While we are not convinced probable cause for a search warrant will always be irrelevant in GPS use cases, under the circumstances here, the grant of permission to attach the monitoring device was appropriate because at a minimum, it amounted to a prior judicial determination that Mr. Jackson's privacy interest in his vehicles was insufficient to prevent the governmental intrusion. We need not further address probable cause regarding warrants # 2 and # 3.

4. Warrant # 7, Magistrate's Legal Authority
The issue is whether the trial court erred by refusing to suppress Valiree's counseling records seized pursuant to search warrant # 7 over the objection it was signed by a Spokane County District Court Commissioner whose office had not been lawfully created.
Mr. Jackson's remedy typically would be suppression of the evidence obtained under the warrant. See, e.g., State v. Riley, 121 Wash.2d 22, 30, 846 P.2d 1365 (1993). But since he is the only one who introduced any of the evidence, no relief is available and the issue is moot. The defense indicated in its opening statement that it would be presenting the testimony of counselor Laura Miller as part of its case. It did so. The State had already decided not to call Ms. Miller and no *273 evidence suggesting sexual abuse was offered during trial.
Moreover, we recently rejected the same theory in upholding the validity of the Spokane County District Court Commissioner positions, including the one involved here. See State v. Amodio, 110 Wash.App. 359, 40 P.3d 1182 (2002).
The judgment and sentence is affirmed.

CONCLUSION
The trial court did not err in the ways alleged by Mr. Jackson. The GPS warrant applications should be viewed in the context of a private affairs analysis under article I, section 7 of the Washington Constitution. Substantively, the judge granting permission to apply the GPS devices offended neither Washington nor federal constitutional principles.
A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
SCHULTHEIS and KURTZ, JJ., concur.
NOTES
[1] We also acknowledge, but decline to follow, State v. Campbell, 306 Or. 157, 759 P.2d 1040 (1988). There, the court construed the Oregon Constitution, art. I, § 9, to hold that the warrantless fixture and subsequent monitoring of a radio transmitter attached to defendant's vehicle violated state privacy rights. We do not consider that court's reasoning based upon Oregon's textually-different privacy rights to be dispositive of a "private affairs" analysis under the Washington Constitution.
[2] Our reasoning limits the need to discuss Franks in connection with warrants # 2 and # 3, except as to how they may bear on our private affairs analysis. Mr. Jackson's privacy interest in his vehicles was insufficient to avoid a prior judicial determination granting permission to install the GPS devices. On the other hand, Mr. Jackson's focus is alleged material police misstatements or critical omissions in probable cause affidavits. First, that he was refusing or still had not taken a polygraph test (warrant # 2). Second, that when he did submit to the test he produced deceptive/failed results, which he attributes to faulty testing procedures (warrant # 3). While the polygraph allegations may bear on a case in which a warrant is required, we discern no such bearing in Mr. Jackson's case because probable cause was not necessary to decide.