IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In Re the Personal Restraint of | No. 83437-1-I |
|---|---|
| ROBERT LEE PRY, | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

COBURN, J. — Robert Lee Pry seeks relief from his convictions for murder in the first degree, kidnapping in the first degree, identity theft in the second degree, possession of stolen property in the second degree, and tampering with a witness in the second degree. He argues that he is entitled to a new trial for his murder and kidnapping convictions in light of an affidavit submitted by a coparticipant, who had not testified at trial. He also challenges the trial court's denial of his request to change venue and contends his counsel was ineffective for not objecting to an exceptional sentence. Because Pry fails to demonstrate that he is entitled to relief, we deny his personal restraint petition (PRP).

FACTS

In December 2015, Robert Pry and Joshua Rodgers Jones[1] went to rob the Bremerton home of 89-year old veteran Robert Hood. Robert Davis, Pry's friend and former boss, assisted with their plans. On the night of the murder, Pry and Rodgers Jones severely beat Hood, causing extensive injuries to his head,

---

[1] Rodgers Jones' name appears in different variations throughout the record. We refer to him as "Rodgers Jones" without a hyphen as that is how he writes his name in the affidavit.

Citations and pin cites are based on the Westlaw online version of the cited material.

neck, and spine.  They "hogtied" Hood, tying together his wrists and ankles together with rope.  Hood's death was a consequence of the combination of his head trauma, being hogtied, and his inability to breathe.  From Hood's home, Pry and Rodgers Jones stole cash, checks, financial and personal documents, and various antiques.

Immediately after the robbery, Pry, his girlfriend Ocean Wilson, his sister Shawna Dudley-Pry, Rodgers Jones, Davis and some other friends and acquaintances traveled to Fife to go gambling.  While in Fife, Pry unsuccessfully tried to access Hood's bank accounts by writing fake checks, attempting to transfer funds online, and by impersonating Hood over the telephone.  Davis invited Alisha Small from Seattle to use her accounting expertise to help Pry access Hood's accounts.

Over the next week, Pry and Rodgers Jones tried to dispose of Hood's body, involving more than a dozen family members, friends, and unwitting strangers.  Pry drove Hood's body in the trunk of a stolen Honda and tried to dump him in an undeveloped area near Teal Lake.  Pry had spray painted the Honda black.  The Honda became stuck in the mud, which required the assistance of several individuals to assist Pry and Rodgers Jones with its recovery.  Once Pry had the Honda back, he enlisted the help of another friend, Arnold Cruz, to help him dispose of the body.

Cruz and Pry unsuccessfully attempted to bury Hood's body on Cruz's property.  At some point, Hood's body was placed into a 55-gallon blue barrel

2

Cruz kept on his property. The barrel then traveled in multiple vehicles of individuals acquainted with Cruz. Finally, Cruz took the barrel to the home of Zakary Bonds where police later recovered it and discovered Hood's body. Pry was arrested.[2]

The State charged Pry with murder in the first degree, robbery in the first degree, kidnapping in the first degree, identity theft in the second degree, possession of stolen property in the second degree, and tampering with a witness.[3] A jury convicted Pry on all five counts. By special verdict the jury also found that Pry acted with deliberate cruelty, knew Hood was particularly vulnerable, and demonstrated an egregious lack of remorse on the murder, kidnapping, and robbery charges. At sentencing, the court concluded that Pry's murder and robbery convictions merged and the robbery conviction was vacated. The court imposed an exceptional sentence of 958 months.

Pry unsuccessfully appealed his conviction.[4] Pry's judgement and sentence became final on January 28, 2020 and he timely filed this PRP within one year. RCW 10.73.090(3)(b).

---

[2] With the help of a police informant, Pry was arrested on December 22, 2015, eight days prior to the recovery of Hood's body on December 30, 2015.

[3] Pry's convictions for murder and robbery in the first degree were subsequently merged into a single felony murder conviction.

[4] State v. Pry, No. 77930-3-I (Wash. Ct. App. Nov. 13, 2018) (unpublished), https://www.courts.wa.gov /opinions/pdf/779303.PDF. The Supreme Court denied Pry's petition for review. State v. Davis, 192 Wn.2d 1022, 435 P.3d 288 (2019). In State v. Pry, 194 Wn.2d 745, 452 P.3d 536 (2019), the Supreme Court reviewed only issues related to Pry's co-defendant Arnold Cruz.

DISCUSSION

Standard of Review

A petitioner may request relief though a PRP when they are under unlawful restraint. RAP 16.4. But Washington courts have limited collateral relief through a PRP, as such relief "'undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders.'" In re Pers. Restraint of Davis, 152 Wn.2d 647, 670, 101 P.3d 1 (2004) (quoting In re Pers. Restraint of St. Pierre, 118 Wn.2d 321, 329, 823 P.2d 492 (1992)). A petitioner must therefore prove a constitutional error resulting in actual and substantial prejudice, or alternatively, a non-constitutional error with a fundamental defect that results in a complete miscarriage of justice. Davis, 152 Wn.2d at 672. A petitioner must show an error by a preponderance of the evidence. In re Pers. Restraint of Monschke, 160 Wn. App. 479, 488, 251 P.3d 884 (2010).

Newly Discovered Evidence

Pry argues that newly discovered evidence exonerates him from the murder and kidnapping charges and entitles him to a new trial.

Newly discovered evidence entitles a petitioner to relief if the evidence requires vacation of the conviction or sentence to satisfy the "'interest of justice.'" In re Pers. Restraint of Lui, 188 Wn.2d 525, 569, 397 P.3d 90 (2017) (quoting In re Pers. Restraint of Lord, 123 Wn.2d 296, 319, 868 P.2d 835 (1994); RAP 16.4(c)(3). For the exception to apply, a petitioner must show that the evidence: "'(1) will probably change the result of the trial; (2) was discovered since the trial;

(3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching.'" Lui, 188 Wn.2d at 569 (quoting Lord, 123 Wn.2d at 319-20). The absence of any one of the five factors is grounds to deny a new trial. In re the Pers. Restraint of Brown, 143 Wn.2d 431, 453, 21 P.3d 687 (2001).

Pry presents a January 2017 sworn affidavit from Joshua Rodgers Jones, a co-participant in the crimes whose case was severed from Pry's case prior to trial.[5]  In his affidavit, Rodgers Jones alleges that Pry was not involved in the kidnapping and murder of Hood and claims that his defense attorney refused to let him come forward with the exculpatory information.

According to Rodgers Jones' affidavit, he, Dudley-Pry, and Pry were driving home from a friend's house and he asked Dudley-Pry to stop the car so he could go see a friend.  Leaving Dudley-Pry and Pry in the car, he went to Hood's home and when Hood answered, Rodgers Jones asked him if he could borrow some cash.  While offering Rodgers Jones the requested cash, Hood tried to hug him.  In response, Rodgers Jones, "triggered" by a "memory of my [sexual] abuse," pushed and punched Hood and he "fell on his head" and became unconscious.  After tying Hood up with some rope, Rodgers Jones dragged him into the bathroom.  He then searched Hood's home for items of

---

[5] In October 2016, a few weeks after Pry was sentenced, Rodgers Jones pleaded guilty to murder in the first degree, identity theft in the first degree, and possession of stolen property in the second degree.

value. Rodgers Jones left Hood's home and discovering that Dudley-Pry and Pry had left, he walked home. Later, Rodgers Jones asked Pry if he

> would work on some paperwork I had[.] [H]e told me he would and he did but had no idea where any of it came from, I never told anyone where any of the paperwork came from. [Pry] tried to work on it but it didn't work[.] [H]e couldn't get any paperwork or checks to work[.]"

Rodgers Jones then went back to Hood's home alone to find him dead. He put Hood in the trunk and then tried to dispose of his body.

Pry contends that Rodgers Jones' new testimony, "[c]ombined with the lack of forensic evidence tying [him] to the scene of the crime" "could have led a reasonable jury to acquit [him]." The State responds that Pry fails to meet the first and fifth factors of the new evidence test because Rodgers Jones' new testimony would not have changed the result of Pry's trial and such evidence would be merely cumulative or impeaching.[6] A witness who admits to the crime and corroborates a defendant's version of events can hardly be considered merely cumulative. However the new testimony would be merely impeaching as to testimony from other witnesses.

More importantly, the new testimony would not have changed the outcome of Pry's trial. Pry's primary trial strategy was to create the exact same narrative as Rodgers Jones' affidavit: that Rodgers Jones alone committed the murder, robbery, and kidnapping. The jury rejected this theory.

---

[6] The State does not challenge that Rodgers Jones' affidavit meets the second, third, and fourth prong of the newly discovered evidence test. As Pry fails to meet the first prong of the test, we need not address whether the affidavit satisfies the other prongs.

Pry, along with Davis and Cruz, asked the court to sever his criminal proceedings from Rodgers Jones' case. The court granted the motion. Rodgers Jones' severance from Pry's trial allowed Pry to portray Rodgers Jones as the sole criminal actor. Pry's opening statement immediately set up this theory:

> Ladies and gentlemen, the person who murdered Robert Hood is not in this courtroom today. You heard the State talk about Joshua Rodgers Jones. You're going to hear a lot about Joshua Rodgers Jones, the person who had been to Robert Hood's house prior to this event, had befriended Robert Hood, and who was [the] one that murdered Robert Hood.

During trial, Pry elicited testimony from law enforcement that Pry had told them during interviews that he had never been to Hood's property and Rodgers Jones confided in Pry that he had assaulted Hood. He elicited testimony from witnesses to portray Rodgers Jones as possessing a "violent nature" and a "crazy" disposition. In his own testimony, Pry denied any involvement in the robbery, Hood's murder or the cover-up. According to Pry, Rodgers Jones alone went into Hood's home and returned with items he had collected. Pry claimed he learned from Rodgers Jones there might be a body in the trunk of the Honda but Pry did not believe him and never saw Hood's dead body. In closing, Pry continued with his consistent theme that "the person who committed this murder, the person who murdered Robert Hood, is not here in this courtroom." Pry reiterated that Rodgers Jones was violent and he could have "handled [Hood] by himself."

The jury rejected Pry's theory that Rodgers Jones acted alone and were instead persuaded by the narrative put forth by the State's several dozen

7

witnesses over two months of trial: that Pry participated in the murder, robbery, and kidnapping of Hood. The new testimony from Rodgers Jones does not eliminate the inculpatory evidence. The evidence against Pry was overwhelming.

Pry's former girlfriend Ocean Wilson testified that a few days prior to the date of the incident she heard Pry and Rodgers Jones talking about an easy "lick they wanted to hit."[7] The night of the murder, Rodgers Jones and Pry put on "dark clothing" and beanies. Wilson heard Davis tell them, "Don't fuck this up, don't get us caught." Rodgers Jones and Pry responded, "We got this."

Hood's neighbor, Edward Scholfield, placed Pry outside of Hood's home the night of the murder. Scholfield testified that after Pry's sister yelled for him to get in the car, Pry stated, "Everything is okay. I got it taken care of." Pry admits he saw Scholfield that night and Scholfield told him to leave.

Wilson testified that when Pry returned from Hood's home, Pry revealed items contained in a pillowcase. Several of Hood's items were eventually recovered in Pry's home[8] including Hood's personal and financial documents including bank statements and deposit slips, social security card, driver's licenses, checkbook, credit and medical services cards, among other things. Law enforcement officers also recovered Hood's antique shotguns, shells, and a razor from Pry's home. Pry's fingerprints were on some of Hood's items. From

---

[7] A "lick" refers to a robbery.

[8] Pry lived in a shared home with Wilson, another woman and her children. At some point Rodgers Jones also lived in the home.

Pry's home, law enforcement also recovered a handwritten note that said, "We have to go handle the old man like right now, then we can milk it."

Alone with Wilson after going to Hood's home, Pry showed her a "wad of one hundreds" he had obtained. Pry confided in Wilson as to what had happened at Hood's home:

> [Pry] told me that -- when they went up to the man's house, that he knocked on the door and told the man that he was God. And that they had tied the old man up and hit him and asked him if he had raped kids in the past. And I guess the old man, Mr. Hood, had confirmed that that was a long time ago. Bubba[9] told me that they left the man in the house tied up, and he was snoring on the floor.

Wilson testified that later she learned that a body was in the trunk of the Honda Pry was driving. Another witness, David Ojeda—Pry's cousin—testified that on the day Pry took Hood's body to Cruz's home, Pry told Ojeda that "there was a pedophile in the trunk." Another witness, Albert Jouravel, who used his truck to help Ojeda and Pry tow the Honda from Teal Lake, saw the "silhouette" of something wrapped in a sheet in the backseat. Once the Honda was freed, Pry drove away quickly. At one point Pry slowed down and Jouravel heard him scream, "Plan B."

Witness Christina Waggoner, who lived with Davis, testified that she saw Pry and Rodgers Jones together sometime in mid-December, looking in the trunk of a car and they "were acting weird." Alisha Small testified that she overheard a conversation in which Davis, Pry, and Rodgers Jones discussed "[h]aving to dispose of a body."

---

[9] "Bubba" is Pry's nickname.

Witness Miranda Bond overheard a conversation between Cruz, Pry, and Pry's sister. Pry's sister "didn't understand why she was in this" and Pry told her "not to worry about it, to go upstairs and worry about the accounts." Pry then told Cruz, "I need you to help me get rid of it. I need to get rid of it." Bond also overheard a conversation between Pry and Rodgers Jones in which they discussed going to an "old man's house, and Pry said that they assaulted him. And then [Rodgers Jones] said he went and got rope and tied the old man up and that Pry left him tied up in the bathroom." They said that the old man got "pieced in."

Wilson was with Pry when he took Hood's body and visited Cruz to ask for help. Wilson saw Pry emerge from Cruz's shed with a shovel in his hand. Pry told Wilson, "he would never get the image of putting that man in a bucket out of his head."

Witness Zakery Bonds, at whose home Hood's body would eventually be discovered by police, testified that Pry came to his house. Pry told Bonds that "stuff was messed up and that he needed to get rid of the car" and he would "be in a lot of trouble."

Law enforcement testified that upon learning of their arrival, Pry asked a friend to make a 911 call about a fake shooting to distract police from the house, threw a cell phone out the window, and then hid under a bed. A cell phone was discovered under the bed where Pry was found hiding which contained photos of Hood's mailbox and financial statements.

The State also presented Jacob Spears, Pry's jail mate, who told the jury that Pry said he was at Hood's murder and Hood died by being "clubbed in the head" and they had taken Hood's body to a friend's home. Pry then asked Spears to help him send a message to a family member outside the prison to "figure out a way to discredit Ocean Wilson."

Pry's testimony did little to refute the overwhelming evidence from the State. He conceded that he participated in the attempt to access Hood's accounts because he thought he "might be able to get some money out of the situation." Pry admitted that he lied to law enforcement during their investigation of the murder. Considering the jury's findings of guilt, it appears Pry's concessions did not rehabilitate his credibility. When asked why he agreed to go help Rodgers Jones, who he believed to be crazy, to perform some unknown task, Pry answered that Rodgers Jones was his roommate and sister's boyfriend. When asked why he was involved in spray painting the Honda, he testified that he did not want to drive around in a car "with a ridiculous paint job" and it was unrelated to having been seen by Hood's neighbor Schofield. This contradicted Pry's earlier trial testimony that the car was painted because it had been seen by Hood's neighbor.

Pry's testimony also acknowledged that he had been at several locations that were connected to Hood's decomposing body: an area near Teal Lake, Arnold Cruz's property, and Zakery Bonds' house. Pry offered many reasons for his presence in these places. When asked why he repeatedly went back to Teal

Lake to try and recover the Honda from the mud—despite claiming he never saw Hood's body—he said he "didn't want my possessions linked to that vehicle. I didn't want nothing of mine or my fingerprints or anything around any of that." When asked why he went to Cruz's home he said he was helping Cruz move some "washer and dryers" and denied digging a hole there. Pry testified he knew nothing about the four-foot, nine-inch long, two-feet deep hole found there by law enforcement. Finally, when asked why he was at Zakery Bonds' home, where Hood's body was eventually recovered, Pry testified simply that he wanted to borrow some money from him.

Other parts of Pry's testimony reflected credibility issues. When asked why he hid when the police showed up at his home, Pry said, "I can't even tell you what I was thinking, really. I mean, I knew that – all I did was hide under the bed, you know, try to scrounge up a cigarette and smoke some weed." Pry conceded that he wrongfully used another inmate's prison account to make a jail call to ask someone to destroy an incriminating letter and another call in which he told his brother to ensure Wilson was thinking about "her future."

The jury found Pry guilty of all charges after hearing all the State's evidence and Pry's own testimony. The jury rejected Pry's explicit attempt to portray Rodgers Jones as the sole person responsible for Hood's murder. Pry fails to establish that Rodgers Jones' testimony would probably have changed the result of Pry's trial. As Pry fails to meet the first factor of the newly discovered evidence test, we need not address the remaining factors.

<u>Change of Venue</u>

Pry next contends that his Sixth Amendment[10] right to a fair trial by an impartial jury was violated when the trial court denied his request to change venue because of pretrial publicity.

The Sixth Amendment guarantees a criminal defendant the right to a fair and impartial jury. <u>State v. Rupe</u>, 108 Wn.2d 734, 748, 743 P.2d 210 (1987). A trial court should grant a motion for a change of venue when necessary to effectuate a defendant's right to a fair trial. <u>State v. Hoffman</u>, 116 Wn.2d 51, 71, 804 P.2d 577 (1991). Pretrial publicity alone is insufficient to warrant a change in venue. <u>State v. Jackson</u>, 111 Wn. App. 660, 669, 46 P.3d 257 (2002). Where a defendant claims prejudice from pretrial publicity, they must demonstrate a "probability of unfairness or prejudice." <u>Hoffman</u>, 116 Wn.2d at 71. "The fact that 'the great majority of veniremen' remember a case, without more, is 'essentially irrelevant. The relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.'" <u>State v. Jackson</u>, 150 Wn. 2d 251, 269, 76 P.3d 217 (2003) (alteration in original) (<u>quoting</u> <u>Patton v. Yount</u>, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)).

A trial court's ruling on a motion for a change of venue is discretionary and will not be disturbed on appeal without a showing of abuse of discretion. <u>Jackson</u>, 111 Wn. App. at 669. A court abuses its discretion where the discretion

---

[10] U.S. CONST. amend. VI.

13

is exercised in a manifestly unreasonable manner or on untenable grounds. Id.

To determine if a court abused its discretion in denying a venue change, we must

consider the Crudup factors:

> "(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of the prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the charge; and (9) the size of the area in which the venire is drawn."

Jackson, 111 Wn. App. at 670 (quoting State v. Crudup, 11 Wn. App. 583, 587,

524 P.2d 479 (1974)).

In May 2016, Pry filed a motion to change venue. Pry argued that he

would be unable to receive a fair trial in Kitsap County due to local media

coverage of the case, specifically referring to numerous news articles that had

been published in the local newspaper. The trial court denied the motion,

concluding that Pry failed to show a probability of prejudice. We review whether

the trial court's denial of Pry's motion was an abuse of discretion.

The media coverage of Hood's murder was extensive. Several news

articles were published in the local newspaper, the *Kitsap Sun*, and were

circulated both in print and online. In Kitsap County, with a 2015 population of

approximately 260,000 residents, the *Kitsap Sun's* circulation was around 16,000

people. These articles included statements of Rodgers Jones admitting that he

and Pry assaulted Hood in his home and then tried to hide his body. The articles

14

were published in the relatively short amount of time between Hood's murder (December 2015) and Pry's trial (May 2016). Given the pretrial publicity surrounding Pry's trial and the severity of the charges, it is clear that some of the Crudup factors (1, 2, 3, 8, 9) pointed in favor of a change of venue.

But the other Crudup factors (4, 5, 6, 7)—those in the court's or State's control—supported not granting Pry's request to change venue.

The court and the parties exercised great care in selecting a fair and impartial jury. Due to the pretrial publicity in the case, Pry's jury venire was larger – 208 jurors – than a typical criminal case to "ensure an unbiased jury could be selected." Prospective jurors were required to answer a questionnaire, inquiring as to whether they had heard about the case:

> This case involves the death of Robert Archie Hood, who was reported missing on December 19, 2015. There were news reports about the search for Mr. Hood and several suspects leading up to Christmas and continuing until the start of January 2016. Those news reports included details about certain suspects who were wanted in connection with the case, the search for a Honda with Oregon license plates and a blue barrel. Have you heard or read anything about this case and/or the defendants?

The questionnaire also asked prospective jurors if they would follow the court's instruction not to view or discuss any media coverage. In addition to the questionnaire, the court asked the prospective jurors if they had read a recent article about the case in the *Kitsap Sun*. As articles continued to be published during jury selection, the court specifically directed the jurors not to open or read

15

the *Kitsap Sun* and to disable the *Kitsap Sun* on social media.[11]

The State and defense attorneys individually questioned 28 prospective jurors who indicated that they had seen media about the case, or had heard about the case from others. The court granted multiple requests from defense attorneys to excuse prospective jurors for cause related to the extent of their media exposure. But most of the prospective jurors questioned about their media exposure indicated that they could not remember specific details about the case, or if they did remember, the details were trivial, such as hearing about a missing older man or that there had been a murder.

Pry highlights that 28 out of 208 jurors, more than 10 percent, were questioned about their exposure to pretrial publicity. But he does not cite to anything in the record to suggest that any seated juror created a probability of unfairness or prejudice.

As the Washington Supreme Court stated in Jackson, that a juror might "remember a case, without more, is 'essentially irrelevant.'" Instead, the relevant inquiry is whether a juror "'had such fixed opinions that they could not judge impartially the guilt of the defendant.'" Jackson, 150 Wn.2d at 269 (quoting Patton, 467 U.S. at 1035.

Pry also contends, without citing to the record, that defense used eight peremptory challenges because of pretrial publicity exposure and if they had not

---

[11] Throughout trial, the court continued to inquire as to whether the jurors were able to comply with its instructions not to read any media reports related to the issues presented at trial.

had to use those challenges for that purpose, they could have used those peremptory challenges for other jurors. We first note that Pry does not argue that the trial court improperly denied a for-cause challenge leaving defendants with no choice but to use a peremptory challenge. Second, the defense only exercised eight of their 13 available peremptory challenges.

Where a defendant claims prejudice from pretrial publicity, they must demonstrate a "probability of unfairness or prejudice." Hoffman, 116 Wn.2d at 71. Pry failed to so demonstrate. Publicity alone is insufficient to warrant a change in venue. The trial court did not abuse its discretion in denying Pry's motion to change venue.

<u>Ineffective Assistance of Counsel</u>

Finally, Pry asserts that he received ineffective assistance of counsel because his attorney did not object to the imposition of an exceptional sentence. We disagree.

At Pry's sentencing, the State recommended sentences within the standard range, but to run them consecutive along with added time for the aggravating factors, for an exceptional sentence that totaled 900 months. The pre-sentence investigation (PSI) report also recommended an exceptional sentence for a total of 917 months. Defense asked for a total sentence that fell within the standard range of the murder charge, 411-548 months. The court imposed an exceptional sentence of 958 months.

We apply a strong presumption that counsel's representation was reasonable. State v. Estes, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). To show ineffective assistance of counsel, a petitioner must demonstrate both that "(1) counsel's performance was deficient, i.e., that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced him, i.e., that there is a reasonable possibility that but for the deficient conduct, the outcome of the proceeding would have differed." Monschke, 160 Wn. App. at 490-92 (holding that the prejudice prong from Strickland v. Washington, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), applies in a PRP). We review an ineffective assistance of counsel claims de novo. Estes, 188 Wn.2d at 457.

Several individuals spoke at Pry's sentencing hearing, asking the court to impose a high-end sentence. The lead detective in the investigation, Detective Jason Bowman, Hood's friend Candyce Gratton and her three children spoke in support of the court imposing the maximum sentence allowed. Only one person spoke on behalf of Pry, his aunt, who asked the court not to impose a maximum sentence because there were other people involved in the crimes.

In addition to requesting a sentence between 411 to 548 months, Pry's attorney successfully persuaded the court that the robbery conviction merged with the murder conviction. Defense counsel also asked the court to take into consideration Pry's upbringing that was touched upon in the PSI:

> I was a little bit disappointed in the presentence investigation. I'm not sure that it went through Mr. Pry's situation, his upbringing, as much as I would have liked.

I think by any measure, Mr. Pry did not have a good upbringing or any role models or a regular childhood.

By any measure, his upbringing was a mess. I'm not saying that as an excuse or to say that that somehow does not make him responsible for his actions. I'm just asking the court to take that into account in how Mr. Pry has got to where he's got.

And that's a part of his life, was this upbringing that he had, that as I indicated, it was a mess.

I know that the court likely has a number that they're looking at, and I just ask that the court take that into account, that that number should take into account how Mr. Pry has gotten to where he's gotten.

And the State indicates, it says that Mr. Pry acts like – or indicates that he's somehow a victim of this.

I don't believe that that's the case. But I do believe, and I do believe whole-heartedly, if Mr. Pry had not come into contact or become involved with Joshua Rodgers Jones, that he would never be sitting here. He would never be sitting here if he hadn't become involved with Mr. Rodgers Jones.

I think by even the State's evidence in this case, Mr. Rodgers Jones was the impetus and the main actor and the main person involved in this situation. Mr. Pry would not be here if it was not for Rodgers Jones.

So when the court is coming up with a number to sentence Mr. Pry, I would just ask that you take that into account in determining that number.

The court did take into consideration Pry's upbringing:

It did not come as a particular surprise to this court that Mr. Pry's childhood and family experience was less than what we would all hope for a child.

It's pretty clear that Mr. Pry is, in some parts, one of the clearest examples of a failure of our system on every level.

Mr. Pry is 30-years-old. I don't remember when he turned 30, but I believe he's currently 30-years-old. He has been to prison four times. This will be his fifth trip to prison in adulthood, that's 12 years in duration.

He's been on community custody for 11 years of his, again, 12 years of adulthood.

He was raised by parents who led a life of crime, and began using drugs himself when he was, according to the PSI, about ten-years-old. And I am confident to say, not necessarily agree with you, Mr. Drury, that had he not been involved with Joshua Rodgers Jones he wouldn't have been here, not sure about that. But I am confident that if Mr. Pry had been raised by different people, he probably would be a different person. Mr. Pry has sat in this courtroom for months, and I've seen other sides to him.

I've seen that he's able to behave in a polite and respectful manner, that he loves his siblings intently, that he has shown some loyalty to those that mean something to him. I've seen that side of him.

Despite those circumstances, the court could not ignore Pry's "career of crime" and the "brutal" crime committed against Hood. The court noted it was "almost speechless" when considering Pry's actions:

> [T]his was a brutal act of selfishness.
>
> . . .
>
> [Hood] was also chosen, I believe, because he was vulnerable. He was chosen because he was probably unlikely to be able to defend himself. And I'm without a doubt that those part[s] of the factors that came into play in picking Mr. Hood to be the victim of this offense.
>
> After assaulting and tying Mr. Hood up, he was left bleeding on his bathroom floor and left to die.
>
> No one in this case tried to aid Mr. Hood. No one made an anonymous call to 9-1-1 to try to save him. He was left . . . like a piece of trash on the floor in the home that he lived in his entire life from his childhood.
>
> Then, after brutally assaulting Mr. Hood and leaving him to die, Mr. Pry and his friends blithely go off to the casino in Fife where their whole goal at this point is to enjoy the fruits of their labor and to try to see if they can get more out of Mr. Hood.
>
> This wasn't the end of the story for Mr. Hood with Mr. Pry. Instead of leaving Mr. Hood for his family and friends to have a chance to be able to say goodbye to him and give him the funeral he deserved, Mr. Pry put Mr. Hood into the trunk of a car for the purpose of disposing of the body and hiding the evidence of his crime.

20

In the end, really, if you put it down to the truth of it, the intent of this was to deprive the family of the dignity of giving Mr. Hood the funeral that he deserved, and really to deprive the family and friends of a chance to say goodbye to Mr. Hood.

When dumping the body of Mr. Hood in a wooded area in Jefferson County didn't work, Mr. Pry left his body with Mr. Cruz in a barrel.

Mr. Pry then just washes his hands of the whole affair and goes on with his life.

The court emphasized the jury's finding of the aggravating factors of deliberate cruelty, lack of remorse, and a particularly vulnerable victim. The court found that the "vulnerability of the victim, and the cruelty [to] the victim, are really the factors that had the most weight with this court." In addition to the aggravating factors, the court noted that the standard range of 411-548 months on the murder and the 51-68 months for kidnapping was "clearly insufficient under the facts of this case and the history of the defendant." The court also rejected the State's recommendation as well as the recommendation from the PSI report, and imposed an exceptional sentence of 958 months.

Pry is correct that his defense attorney did not specifically object after the court imposed the exceptional sentence. However, counsel did not need to object to make his position clear; he had already made his recommendation and argued the basis for that recommendation. The court's explanation as to why it was imposing an exceptional sentence was supported in the record. An objection at this point would have been nothing more than to repeat the defense's position that it disagreed and recommended a different sentence. Counsel was not deficient for not objecting under these circumstances.

The trial court electing to impose a sentence even greater than what was recommended by the State and in the PSI report evidenced the court's strong inclination to impose an exceptional sentence.  Even if Pry could show that his defense counsel should have objected to the exceptional sentence specifically, Pry fails to demonstrate that a reasonable possibility existed that any objection would have changed the outcome of his sentencing hearing.  Pry's counsel was not deficient.  Pry's ineffective assistance of counsel claim fails.

For the reasons explained above, Pry fails to demonstrate that he is entitled to relief.  We deny his petition.

_____
Coburn, J.

WE CONCUR:

_____     _____